UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**PREMIER DEALER SERVICE, INC.,**

    **Plaintiff,**

v.

**ALLEGIANCE ADMININSTRATORS, LLC,** *et al.,*

    **Defendants.**

Case No. 2:18-cv-735
Chief Judge Edmund A. Sargus, Jr.
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

This matter is before the Court on Plaintiff Premier Dealer Service, Inc.'s ("PDS") Motion for Preliminary Injunction (ECF No. 4), Defendant Allegiance Administrators, LLC's ("Allegiance") Response in Opposition (ECF No. 9), and PDS's Reply. (ECF No. 12). The Court held a preliminary injunction hearing on September 25, 2018, after which the Court ordered the parties to file simultaneous briefs and then responses. (ECF Nos. 31, 32, 33, 34). After PDS filed its final brief (ECF No. 33), Allegiance filed a Motion to Strike evidence and an argument from PDS's final brief. (ECF No. 35). Subsequently, PDS filed a Response (ECF No. 36) to the Motion to Strike, and Allegiance filed a Reply. (ECF No. 37). For the reasons that follow, the Court **DENIES** PDS's Motion for Preliminary Injunction, and **DENIES as MOOT** Allegiance's Motion to Strike.

I.

PDS and Allegiance compete as administrators of automobile service contracts ("Service Contracts"). Service Contracts, commonly known as extended warranties, are agreements between an obligor and a customer purchasing a vehicle. With any Service Contract, the obligor

agrees to repair or replace, for a specific coverage period, certain vehicle parts following a breakdown. The Service Contracts must be backed by an insurance company, which works with the obligor and an administrator to approve the terms and manage the risk. The total price of any Service Contract is known as the "Dealer Cost."

For the customers who enter a Service Contract, the lumpsum Dealer Cost is straightforward. For the four other parties involved in any Service Contract (the obligor, administrator, insurer, and dealer), however, Dealer Costs are comprised of several parts: first, there is the marketing fee, which is set by the obligor and paid to the dealership that sold the Service Contract; second, the administration fee, which is a flat fee negotiated between the obligor and the administrator; third, the insurance fee, which a pre-selected insurer determines and approves; fourth, the road assistance fee for which the obligor also negotiates; and fifth, the Reserve, which is the calculated amount that the obligor and the administrator determine and then set aside to pay future claims.

The Reserve amount is critical to an obligor's success because the obligor must market programs at competitive prices but must also allocate an appropriate amount for future claims. If the Reserve amount does not cover a claim, then the obligor and the insurer bear the loss. To protect each party involved, the Dealer Costs and its five components are generally considered confidential throughout the industry.

Tricor Automotive Group ("TAG"), which is not a party to this case, was the obligor in all Service Contracts relevant to this lawsuit. TAG offers affiliated automobile dealerships throughout Canada various Service Contracts that those dealerships sell to customers buying new and used vehicles. From 2001 to May 29, 2018, PDS served as TAG's administrator of Service

Contracts. Within that role, PDS began using its "Rating Process" in 2008 for Service Contracts sold through TAG-affiliated dealerships in Canada.

On October 1, 2014, TAG and PDS executed an agreement ("2014 Agreement") that stated the terms of their business relationship. In the 2014 Agreement, TAG and PDS assented to several important terms. First, the parties defined "Confidential Information":

> "Confidential Information" shall mean this Agreement and all data, trade secrets, trademarks or marks, business information, Programs, Dealer Cost, and any other information of any kind whatsoever that a party herein discloses, either orally or in writing, to the other party. A writing shall include an electronic transfer of information by electronic mail, over the Internet or otherwise.

Ex. 5, at 3 – 4. Notably, the 2014 Agreement itself is Confidential Information. Second, each party agreed to protect "all Confidential Information" of the other. *Id.* at 17. But nothing in the contract explains what qualifies as either party's property. Third, the 2014 Agreement defined the duties of TAG and PDS related to development and maintenance the Dealer Cost, stating:

> TAG shall be assisted by PDS in co-ordinating Programs with TAG'S INSURER and shall be responsible for development of all PROGRAMS including … Premium, Reserves, and third party fees and commissions. These amounts plus the Administration Fees set by PDS shall comprise the Dealer Cost.

*Id.* at 6. This language charged TAG with the responsibility of developing the Reserves and Dealer Costs. *Id.* at 6. To do so, TAG "tweaked [the Reserves] on an annual basis, and that was solely in response to what the OEMs [(Original Equipment Manufacturers)] did. So if the OEMs raised their price, we raised ours. If the OEMs stayed flat, we stayed flat. So we've always looked at the OEM as our guide for pricing." *Prelim. Inj. Hr'g Tr.* at 117:1 – 6. As for PDS, the 2014 Agreement states: "PDS shall manage its administrative rating systems in strict compliance with the set Dealer Cost Amounts." Ex. 5 at 6.

While still working with PDS under the 2014 Agreement, TAG explored the prospect of investing in its own administrative platform since TAG "wanted to have a stake in the table so

3

[it] could help control [its] destiny as car dealers." *Prelim. Inj. Hr'g Tr.* 153:4 – 5. In September 2017, TAG approached PDS to discuss a potential deal. After PDS presented its offer, TAG's board of directors sought to "find out what the real value of our business might be to somebody." *Id.* at 154:17 – 18. To that end, TAG considered Allegiance, which had been conducting business with TAG-affiliated companies since 2006. *Id.* at 154:19 – 21.

In November 2017, the President of TAG, Joseph Campbell, contacted Allegiance's Director of Underwriting and Actuarial Services, Paul Miles. Campbell consulted Miles because he wanted "somebody who could assist [TAG] in evaluating the rates we were charging them, not so much setting them, but yet evaluating them, and then going forward." *Id.*, 155:13 – 16.

By December 2017, TAG and Allegiance had entered a "quasi-general agreement" about TAG's value. *Id.* at 155:2 – 8. Around that time, TAG and Allegiance also began discussing "whether [Allegiance] could admin [TAG's Service Contracts] knowing it was going to disrupt [TAG's] business no matter what." *Id.* at 155:2 – 4. Then, in January 2018, TAG determined that Allegiance would be able to administer the Service Contracts because Allegiance had experience in the industry and actuarial support. *Id.* at 155:9 – 16.

On January 25, 2018, Campbell sent Miles TAG's total Dealer Costs and flat fees that represented what the fees "would be on a go-forward business with Allegiance as administrator." *Id.* at 195:18 – 20. It is unclear whether the Dealer Costs that TAG sent to Allegiance were the same costs that TAG used in its Service Contracts administered by PDS ("TAG-PDS Dealer Costs"). Miles testified, "[k]eep in mind, I don't know what the flat fees were on the previous arrangements, so I don't know that that's equal to the reserve that was currently in place, but that's what I'm referring to as a proposed reserve, in case those fees were different." *Id.* at 195:11 – 15.

4

With the Dealer Costs and the Reserves that Campbell provided ("Proposed Reserves"), Miles adjusted the rate cells. *Id.* at 198:2 – 17. Miles modified TAG's Proposed Reserves using data that Allegiance had amassed over decades, interviews with TAG personnel, and programs Allegiance had already developed. *Id.* at 198:5 – 17. Although Miles tweaked the Proposed Reserves, he kept the overall average of the Proposed Reserves the same. *Id.* at 198:2 – 4.

On May 29, 2018, the relationship between PDS and TAG ended. For a time, PDS allowed TAG-affiliated dealers to access its database system so that dealers could adjust or cancel Service Contracts. In July 2018, PDS analyzed how TAG dealerships were using its portal. This analysis indicated that TAG-affiliated dealers continued accessing the portal—around 3,000 times—to backdate contracts, which allowed the dealers to potentially solicit PDS's rate information.

PDS filed this lawsuit against Allegiance and Dimension in the Franklin County Court of Common Pleas, alleging misappropriation of trade secrets, copyright infringement, conversion, replevin, and tortious interference of a contract and business relations. *See Pl.'s Am. Compl.* Allegiance removed to this Court. PDS then filed a motion for preliminary injunction to enjoin Allegiance from using its alleged trade secrets.

**II.**

The purpose of a preliminary injunction is to preserve the positions of the parties until the court holds a trial on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 191 S. Ct. 1830, 68 L. Ed. 2d 175 (1981). "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries [its] burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002).

When addressing a motion for preliminary injunction, courts must consider and balance four factors: (1) whether the movant has demonstrated a substantial likelihood of success on the merits; (2) whether the movant has shown irreparable injury; (3) whether the preliminary injunction could harm third parties; and (4) whether the public interest is served by issuing the preliminary injunction. *Gill v. Konczalski*, 951 F.2d 349 (6th Cir. 1991) (citing *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985)). "These factors are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). A district court is required to make specific findings about each factor unless fewer are dispositive of the issue. *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995).

### III.

### A. PDS has Failed to Demonstrate a Substantial Likelihood of Success on the Merits.

To obtain a preliminary injunction, a plaintiff must show more than a mere probability of success. Instead, the plaintiff "must demonstrate, among other things, a strong or substantial likelihood or probability of success on the merits." *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 35 (6th Cir. 1992).

To prevail on a misappropriation of trade secrets claim, a plaintiff must show by a preponderance of the evidence that: (1) a trade secret exists; (2) the defendants acquired the trade secret because of a confidential relationship; and (3) the defendants used the trade secret without authorization. *Hoover Transp. Serv., Inc. v. Frye*, 77 Fed. Appx. 776, 782 (6th Cir. 2003). "Proof by clear and convincing evidence is required to justify relief in trade secrets cases under O.R.C. § 1333.62." *Prosonic Corp. v. Stafford*, 539 F. Supp. 2d 999, 1005 (S.D. Ohio 2008). For the

reasons explained below, PDS has not demonstrated a substantial likelihood of proving these elements.

### 1. PDS Has Failed to Establish the Reserves Are a Trade Secret.

In its Complaint and Motion for Preliminary Injunction, PDS claims that Allegiance misappropriated PDS's Rating Process. At the preliminary injunction hearing, however, PDS claimed that Allegiance only misappropriated information regarding the TAG-PDS Reserves. The current issue, then, is whether PDS has trade secret protection in the TAG-PDS Reserves.

An Ohio statute defines a "trade secret" as:

> [I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D). For additional guidance, the Supreme Court of Ohio interpreted that statute and adopted six factors to identify a trade secret:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. The Plain Dealer v. Ohio Dept. of Ins.*, 687 N. E. 2d 661, 672 (Ohio 1997) (citing *Pyromatics, Inc. v. Petruziello*, 454 N. E. 2d 588, 592 (Ohio Ct. App. 1983)). Although no one factor is dispositive, the most important factor is whether "a business or possessor of a potential trade secret must take some active steps to maintain its secrecy." *Heartland Home Fin., Inc. v.*

7

*Allied Home Mortgage Capital Corp.*, 258 Fed. Appx. 860, 862 (6th Cir. 2008) (internal citations omitted). Those active steps need only be "reasonable" under the circumstances. *Id.*

Before addressing whether the Reserves are a trade secret, PDS must establish that it has some ownership in the Reserves. To do so, PDS argues that the Reserves were a product of its Rating Process. Allegiance, on the other hand, claims that TAG set the Reserves by undercutting the market and then directing PDS to use its Ratings Process to make the numbers work with those Reserves. *Id.* at 129:3 – 7. Without setting or controlling the Reserves, Allegiance argues, PDS had no proprietary interest in the Reserves.

At this stage in the proceedings, the Court finds merit in Allegiance's argument. Based on the 2014 Agreement, TAG set the Dealer Costs, and therefore, the Reserves. In contrast, PDS "manage[d] its administrative rating system in strict compliance with" those amounts. Ex. 5 at 6. In addition to the 2014 Agreement, testimony on several topics further illustrates that TAG exclusively owned the Reserves.

First, TAG set the Reserves by "tweak[ing the Reserves] on an annual basis, and that was solely in response to what the OEMs did." *Prelim. Inj. Hr'g Tr.* at 117:1 – 6. Although PDS contends that it used the Rating Process in 2008 to set the Reserves for different classes of vehicles, those projects occurred before the 2014 Agreement. At some point, the Service Contracts industry became a commodity, and so, Reserves began to fluctuate at industry-standard rates. *Id.* at 116:24 – 117:6; 118:4 – 5. Based on these standardized rates, TAG began settings its Reserves by simply undercutting the Original Equipment Manufacturer ("OEM") prices to compete. *Id.* As Campbell explained it, "[w]e knew what we needed and what we had to do from a competitive standpoint. So it was, 'Here's what we need. Here's the way we want to do it.' " *Id.* at 129:4 – 6. While TAG occasionally consulted PDS when considering inflationary

adjustments to the Reserves, TAG unequivocally made the final decision. *Id.* at 141:17 – 142:4. Therefore, without controlling, adjusting, calculating, or accounting for the Reserves, PDS cannot validly claim ownership of them.

Second, TAG and its insurer bear the risks affiliated with the TAG-PDS Reserves. Because the obligor in any Service Contract must support its Reserves, the obligor carries the risk. *Id.* at 132:8 – 11; 183:18 – 184:1. On the other hand, PDS bears no financial risk for the Reserves' accuracy. *Id.*

Third, TAG lists the TAG-PDS Reserves as equity in its accounting records. As an insurer and obligor, TAG-owned companies have $160 million in shareholder equity standing behind the Reserves. *Id.* 144:2 – 12. In contrast, PDS offers no evidence or testimony related to financial records that indicate PDS's interest in the Reserves. In terms of ownership, this one-sided comparison illustrates that TAG solely owns the Reserves.

In conclusion, as to the preliminary injunction, PDS has failed to demonstrate ownership in the TAG-PDS Reserves and therefore cannot claim trade secret protection over them. By failing to establish the first element of its trade secret misappropriation claim against Allegiance, PDS cannot establish a high likelihood of success on the merits. Therefore, the Court need not analyze the remaining elements of PDS's trade secret misappropriation claim.

**B. PDS Has Not Shown Irreparable Harm.**

Under Ohio law, if a plaintiff alleging trade secret misappropriation proves the existence of a trade secret, the plaintiff still carries the burden of demonstrating that misappropriation has occurred or is threatened; simply stating that inappropriate use of the information is inevitable is not sufficient. *Prosonic Corp. v. Stafford*, 539 F. Supp. 2d 999, 1005 (S.D. Ohio 2008) (citing Ohio Rev. Code § 1333.62). Although at this point, PDS has failed to establish its right to trade

secret protection in the Reserves, the Court still analyzes whether injunctive relief would otherwise be appropriate.

Irreparable harm is an injury for which there is no adequate remedy at law, and for which damages would be impossible, difficult, or incomplete. *Basicomputer Corp. v. Scott*, 973 F.2d 507 (6th Cir, 1992). In *Sampson v. Murray*, the Supreme Court held that mere injuries in terms of money, time, and energy are not sufficient for injunctive relief, and that the possibility of adequate compensation weighs heavily against a claim of irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 90, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974). While no single factor determines whether an injunction should issue, a failure to show irreparable harm can be fatal to a motion for injunctive relief. *Southern Milk Sales, Inc., v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991).

In its motion, PDS argues that it will suffer loss of customer goodwill, which is difficult to calculate in terms of monetary damages. While there is certainly difficulty in calculating the economic loss of customer goodwill, it is unclear how PDS's customer goodwill will suffer. PDS's only customer in this case is TAG, and PDS terminated its business relationship with and then sued TAG for monetary damages. *Prelim. Inj. Hr'g Tr.* 77:11 – 18. Without proving more, PDS has failed to demonstrate that injunctive relief is necessary to somehow preserve its relationship with TAG. Therefore, PDS has not shown that it will suffer " 'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *See Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (quoting *Monsanto Co. v. Manning*, 841 F.2d 1126 (6th Cir. 1998)).

PDS also argues that irreparable harm exists because Allegiance can now use PDS's Rating Process to undercut PDS from the market. As discussed at the hearing, however, Allegiance never possessed or accessed PDS's Rating Process. *Prelim. Inj. Hr'g Tr.* 159:16 – 25.

Instead, Allegiance used its own processes and loss data, which included "data that Allegiance has been amassing for several decades, as well as interviews with Tricor personnel, and programs that we've already created without any additional worked needed," to adjust TAG's Proposed Reserves. *Id.* at 160:15 – 18; *Id.* 198:5 – 8. Because Allegiance never used PDS's Rating Process and because Allegiance used its own process for adjusting the Proposed Reserves, PDS has not shown any irreparable harm.

**C. Allegiance Has Shown that an Injunction Would Harm Third Parties.**

The Court must consider whether a preliminary injunction would harm the parties enjoined or others. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 2003). PDS argues that no harm to third parties will result. On the other hand, Allegiance claims that any injunctive would prohibit Allegiance from offering products to customers or performing administrative services to clients. Allegiance asserts that this would result in harm to consumer policyholders, TAG, and dealerships.

The Court agrees with Allegiance. If the Court granted PDS any injunctive relief, third parties transacting business with Allegiance would inevitably suffer harm. An injunction restricting or barring Allegiance's use of the Proposed Reserves or its own actuarial processes would disrupt many businesses that are not parties in this lawsuit. Those stakeholders include Service Contract obligors, insurers, dealers, and customers. Therefore, this factor weighs in favor of Allegiance.

**D. In Conclusion, PDS Has Failed to Establish That Injunctive Relief is Appropriate.**

After balancing the relevant factors, the Court finds that the requested preliminary injunction is currently inappropriate. PDS has failed to establish a strong likelihood of success on the merits and has not adequately demonstrated that it will suffer irreparable harm, absent

11

injunctive relief. On the other hand, Allegiance has shown that third parties would likely suffer if the Court granted the requested preliminary injunction. For those reasons, the Court denies PDS's motion for injunctive relief.

## VI.

Allegiance filed a motion to strike (ECF No. 34) a supplemental argument and evidence in PDS's Final Brief for preliminary injunction. (ECF No. 33). Because the disputed argument and evidence did not determine the outcome of the Court's ruling on this matter, Allegiance's Motion to Strike (ECF No. 34) is denied as moot. *See Hughes v. Lavender*, No. 2:10-cv-674, 2011 WL 2945843, at *5 (S.D. Ohio July 20, 2011) (citing *Pullom v. U.S. Bakery*, 477 F. Supp. 2d 1093, 1109 (D. Or. 2007)).

## V.

For the foregoing reasons, the Court **DENIES** Plaintiff's Motion for Preliminary Injunction (ECF No. 4) and **DENIES as MOOT** Defendants' Motion to Strike. (ECF No. 35).

**IT IS SO ORDERED.**

11-6-2018
DATE

EDMUND A. SARGUS, JR.
**CHIEF UNITED STATES DISTRICT JUDGE**