IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **PREMIER DEALER SERVICES, INC.,** | Case No. 2:18-cv-00735-EAS-CMV |
| | Chief Judge Edmund A. Sargus |
| Plaintiff, | Magistrate Judge Chelsey M. Vascura |
| v. | |
| | SECOND AMENDED COMPLAINT FOR MONETARY, INJUNCTIVE AND OTHER RELIEF, WITH JURY DEMAND ENDORSED HEREON |
| **ALLEGIANCE ADMINISTRATORS, LLC,** *et al.,* | |
| Defendants. | |

**NOW COMES** Premier Dealer Services, Inc., and for its Second Amended Complaint against Defendants Allegiance Administrators, LLC, and Dimension Service Corporation, hereby alleges as follows:

1. Plaintiff, Premier Dealer Services, Inc. ("Premier"), is an Illinois corporation having its principal office in Dublin, Franklin County, Ohio. Premier is in the business of providing products and services to automotive dealerships, agents and their customers.

2. Defendant Dimension Service Corporation ("Dimension"), is an Ohio corporation having its principal place of business in Dublin, Franklin County, Ohio. Defendant Allegiance Administrators, LLC ("Allegiance"), is an Ohio limited liability company having its principal place of business in Dublin, Franklin County, Ohio. On information and belief, Allegiance was created by the merger of Dimension and other entities controlled by Haytham ElZayn.

3. Since approximately 1998, Premier has been in the business of creating, marketing, and administering vehicle service contracts, customer loyalty programs, and other products for automobile dealers.

13589615v1

4. Over the last 18 years, Premier has done extensive business with a Canadian company known as Tricor Automotive Group, Inc. ("Tricor"). Tricor provides services to scores of automobile dealerships across Canada (the "Tricor Dealers"). Tricor offered affiliated dealers various "Programs" which they, in turn, could sell to customers buying new or used vehicles. The Programs included: (a) Vehicle Services Agreements, purchased by consumers to provide mechanical coverage in the event of breakdown of their vehicle; (b) Mechanical Breakdown Insurance, purchased by consumers to provide for mechanical coverage in the event of breakdown of their vehicle; (c) Mechanical Limited Warranties, provided to vehicle purchasers at no charge by dealerships to provide for mechanical coverage in the event of breakdown of their vehicle; and (d), Loyalty Powertrain Products, discussed in more detail below.

5. During the course of its work, Premier assembled possession of information about the repairs that were made to the vehicles of customers who bought service contracts in the United States. Those customers submitted claims; repair bills were generated and covered claims were paid. That paperwork contained raw, unprocessed data about thousands of customers (the "Raw Data").

6. The Raw Data was never in the public domain.

7. In 2006, Premier undertook a major effort to analyze the Raw Data as well as other historical loss data for its Vehicle Service Contracts in U.S. markets. Premier developed a methodology that analyzed many years of repair costs experienced relative to a host of variables, including without limitation make of vehicle, model of vehicle, year of manufacture, odometer, nature, scope and duration of any manufacturer's warranty, the customer's chosen coverage level, and the customer's chosen coverage duration (the "Rating Process").

2

8. Using the Rating Process, Premier was able to make reliable predictions about how much money needed to be set aside for future repairs in any of the thousands of possible permutations of the variables (the "Reserves" or "Rates"). "Reserves" are the proprietary component of the retail cost of a Service Contract, i.e., the portion of the amount paid by the customer that is set aside to be used to pay losses under these agreements. Premier's Rating Process and its fruits—the Reserves or Rates—shall be referred to collectively as "Premier's Trade Secrets." The Raw Data does not contain the Reserves. The Reserves are the product of working the Raw Data.

9. This project was a complete revamping of how Premier looked at vehicle service contracts. Because the project was so important, Premier dedicated significant time, resources, and effort to its completion. Premier's team included three principal analysts who worked full time on the project for approximately six months. Premier invested tens of thousands of dollars in its completion.

10. In 2008, Premier further modified the Rating Process to accommodate differences in the Canadian market. Through additional labor, Premier adapted this Rating Process and the Rates/Reserves it yielded in 2006 for the Canadian market. Premier launched this program in 2008.

11. Through this labor, Premier has developed expertise in the business and has developed and maintained its competitive advantage in the marketplace in part through these proprietary systems and information. Premier's rating process enabled Programs to be marketed at attractive pricing while that accurately addressing costs and risks.

12. Premier's competitors in the business of creating, marketing and administering vehicle service contracts must also calculate Reserves for their products,

3

e.g., how much money is to be set aside if a customer purchases a five-year service contract on a 2015 Nissan Sentra with 30,000 miles on the odometer. While competitors will apply similar principles, the process nevertheless involves professional judgments and each competitor must answer such questions independently. Premier, like other competitors, jealously guards its Trade Secrets. Allegiance considers its own rating process so secret that it brought an action to prevent its use by others but a few years ago.

13. Premier took reasonable efforts to protect the secrecy of its Trade Secrets.

a. Premier's Trade Secrets are unknown outside the company except by persons who have executed a binding non-disclosure agreement.

b. Premier's Trade Secrets are unknown within the company except by employees in Premier's Rate Department and to them only after they have executed a non-disclosure agreement.

14. Premier's Trade Secrets have value by being unknown to Premier's competitors. As Allegiance's Chief Executive Officer has stated in sworn pleadings in another action, "this information gives economic advantage to the person with knowledge of it. It is unknown to the general public, is not readily ascertainable by proper means by persons or entities who have derived economic value from its disclosure and use and was developed . . . with great effort and at great cost for its exclusive benefit."

15. It would take an inordinate amount of time and expense for a competitor to acquire and duplicate Premier's Trade Secrets. As Defendant Dimension has stated in similar litigation, a competitor would have otherwise "to spend years and thousands of dollars building this data and perfecting the procedures."

16. Premier and Tricor entered into a Private Label Marketing Agreement in 2011, a true copy of which is attached at **Exhibit D** ("the 2011 Agreement").  Pursuant to the 2011 Agreement, Premier developed the vehicle service contract forms and marketing materials which Tricor sold under its private label "Tricare."

17. Section 5.2 of that 2011 Agreement states:

> [Tricor] acknowledges that all information obtained in the scope of its agency relating but not limited to the following: trade secrets, marketing strategy, customer lists, product performance data, past requirements of customers, and methods of doing business, to the extent that such information is not generally known by competitors, ***shall be deemed Proprietary Information of Premier and its insurer***.  As a condition of this authorization and thereafter, [Tricor] agrees not to make use of or disclose to any third parties, any Proprietary Information obtained as a result of or in connection with the relationship contemplated herein.  All computer systems, procedures, forms, controls, methods, programs, software, hardware, reports, compilations, used or developed while an agent of Premier ***are the exclusive property of Premier or its insurer*** and may not be shared, sold, disclosed in any manner either during the term of this Agreement or at any other time thereafter.  (Emphasis supplied).

18. Similarly, Section 7.6 of the 2011 Agreement states:

> Intellectual Property. . . .  All forms, records and supplies including, but not limited to insurance forms and ***rate charts***, provided by Premier [per section 2.4], are and will remain the property of Premier, and will be surrendered to Premier immediately upon demand of Premier. . . .  (Emphasis added).

19. Prior to 2014, Premier served as both the Obligor and the Administrator for Tricor.  In 2014, Tricor decided it wanted to serve as the Obligor.  Those terms were memorialized in the October 1, 2014, "the 2014 Agreement," a true copy of which is attached at **Exhibit A**.

20. The 2014 Agreement defines "Confidential Information" to "mean this Agreement and ***all*** data, ***trade secrets***, trademarks or marks, business information,

5

Programs, Dealer Cost, and any other information of any kind whatsoever ***that a party herein discloses***, either orally or in writing, ***to the other party***.  A writing shall include an electronic transfer of information by electronic mail, over the Internet or otherwise."  (Emphasis added).  Per Section XI.A of the 2014 Agreement, Tricor agreed to "keep all Confidential Information of [Premier] confidential."

21. Nothing in the 2014 Agreement superseded the provisions of the 2011 Agreement quoted above regarding Premier's ownership of Premier's Trade Secrets.

22. Nothing in the 2011 Agreement or the 2014 Agreement conveyed, assigned, or otherwise transferred any of Premier's Trade Secrets to Tricor.

23. Premier was never Tricor's employee under either the 2011 Agreement or the 2014 Agreement.  Irrespective of the language of the 2014 Agreement, the Reserves for this Premier product—which Tricor then sold under its "private label"—were always calculated by Premier.

24. One of the products Premier offers is its Lifetime Powertrain Loyalty Program (the "Program").  The Program is designed to give a Lifetime Powertrain Loyalty Program Certificate ("LPLP Certificate") to customers of participating dealers.  Loyalty Powertrain Products are dealership "giveaway" products which promote customer retention and provide for mechanical coverage in the event of breakdown upon meeting various service requirements.  Customers are required to ensure that certain maintenance recommended by the vehicle manufacturer be performed at the dealer's service centers.  Covered parts under the Program include the drive axle and its subcomponents, the transmission/transfer case and its subcomponents, and the engine and its subcomponents.  Premier has been continuously using the registered service marks "Lifetime Powertrain Protection" and "Lifetime Engine Protection" (U.S.

Registration Nos. 4,116,450 and 4,116,449, respectively) in commerce since May 1, 2008.

25. On or about January 25, 2018, Tricor, without Premier's knowledge or consent, disclosed Premier's Trade Secrets—particularly its Reserves or Rates—to employees of Defendant Dimension, including without limitation Paul Miles. Allegiance received Premier's Trade Secrets from Tricor in various ways, including without limitation, in numerous telephone conversations, e-mails, and in-person meetings, which took place between multiple personnel from both Tricor and Allegiance. Tricor provided Premier's Trade Secrets to Allegiance in various electronic formats, including Adobe and Excel files.

26. Approximately one month after the initial wrongful disclosure, Dimension created Allegiance.

27. On information and belief, Dimension gave Tricor a minority interest in Allegiance to persuade Tricor to breach its obligation in the 2014 Agreement to give Premier 12-month's notice of the termination of that exclusive agreement.

28. Tricor accepted Defendants' inducement and began forwarding transactions to Allegiance in lieu of Premier for administration.

29. After complying with the cure provisions of the 2014 Agreement, Premier terminated the 2014 Agreement with Tricor on May 29, 2018. After that date, Tricor had no right to use Premier's Trade Secrets.

30. Without any lawful authority, Tricor Dealers continued to access Premier's electronic portal to illicitly obtain Rates by back-dating transactions to dates prior to the May 29, 2018 termination. These misappropriations of Premier's Trade Secrets

occurred more than 3,000 times. Defendants processed and administered transactions based on these misappropriations.

31. Without Premier's knowledge or consent, Allegiance incorporated Premier's Trade Secrets into an electronic system to facilitate the ability of Tricor's dealers to access Premier's Trade Secrets via the internet.

32. With full knowledge that Premier and Tricor had entered into the Administration Agreement, Defendants took various actions to replicate Premier's Program without Premier's knowledge or consent. Defendants acted in concert with the common objective of hijacking the Program and depriving Premier of the benefits it was entitled to under the Administration Agreements as the creator of the Program.

33. Defendants sought to supplant Premier in Premier's relationship with Tricor, despite Defendants' knowledge that it could not perform the services provided by Premier without access to Premier's proprietary Rating Process. On information and belief, Allegiance and Dimension have no comparable system in the Canadian market place that would enable them to make the sound business decisions yielded by Premier's Trade Secrets.

34. Defendants succeeded in persuading Tricor to breach the Administration Agreement with Premier, including without limitation the term therein requiring 12 months' notice of cancellation. As a direct result of Defendants' actions, Premier will lose significant profits in an amount exceeding the jurisdictional threshold of this Court.

35. Defendants acted with the common objective of hijacking Premier's proprietary Rating Process so as to enable it to do what neither of them could not do on their own, i.e., to step into Premier's shoes and profit from the relationship Premier cultivated over nearly two decades.

36. Allegiance has no physical presence in Tricor's market in Canada. All acts taken by Allegiance were carried out by its employees in and about Dublin, Ohio.

37. In engaging in this conduct, Defendants acted willfully, maliciously and in wanton disregard for the rights of Premier. At all times, Allegiance and Dimension have had actual knowledge that their conduct: was and remains unlawful; was and remains in contravention of Premier's rights; and would proximately result in significant injury to Premier.

38. Defendants' conduct has caused, and, if allowed to continue, will continue to cause, irreparable damage to Premier's business, reputation, and goodwill. Regarding these damages, Premier has no adequate remedy at law.

39. This Court has jurisdiction over this dispute and the parties.

40. Venue is proper in this Court.

## COUNT I
## MISAPPROPRIATION OF TRADE SECRETS

41. Premier incorporates the preceding allegations of its Complaint as if rewritten verbatim herein.

42. Premier shared its Trade Secrets with Tricor after Tricor executed agreements, including without limitation the 2011 Agreement and 2014 Agreement, requiring Tricor to safeguard Premier's Trade Secrets.

43. Premier's Trade Secrets derive independent economic value by not being accessible to Premier's competitors, who can profit from its use or disclosure.

44. Premier has taken all reasonable measures under the circumstances to maintain the secrecy of Premier's Trade Secrets, including by having third parties sign agreements requiring that such information be kept confidential.

9

45. Premier's Trade Secrets are entitled to protection as such under Ohio Revised Code §1333.61 *et seq*.

46. On and after January 25, 2018, Tricor wrongfully disclosed, and Defendants wrongfully accepted, Premier's Trade Secrets, i.e., Premier's Reserves and Rates.

47. As veteran competitors in the vehicle service contract business, Defendants at all times well knew that administrators calculate reserves for their customers and treat these calculations as their own trade secrets. Like Premier, Defendants considers this kind of information such a valuable trade secret that Defendant Dimension has sued to protect it.

48. At the time Tricor disclosed Premier's Trade Secrets to Defendants, Defendants had actual or constructive knowledge that the information provided by Tricor was Premier's Trade Secrets.

49. At the time Tricor disclosed Premier's Trade Secrets to Defendants, Defendants had actual or constructive knowledge that the information provided by Tricor was being disclosed without the knowledge or consent of Premier.

50. At the time of Tricor's disclosure and/or Defendants' use of Premier's Trade Secrets, Defendants knew or had reason to know that Tricor was under a contractual obligation to maintain the secrecy of Premier's Trade Secrets.

51. Allegiance knows now, as it knew when it accepted the Reserve calculations from Tricor, that these were its competitor's trade secrets. Defendants chose to accept and review them for their unfair commercial gain.

52. On information and belief, Defendants made insignificant changes to the reserves to conceal the fact that the rates were based on Premier's Trade Secrets. The

10

changes to Premier's Rates made by Defendants were not based on any independent analysis of Raw Data because Tricor did not provide any Raw Data to Defendants.

53. Defendants chose to use Premier's Trade Secrets as the basis for creating a new "Rate Sheet" that would not be "disruptive" Tricor's operations because of its similarities to Premier's Rates.

54. By the conduct described above, Defendants willfully misappropriated Premier's Trade Secrets.

55. The foregoing conduct of Defendants, including, but not limited to, the misappropriation and commercial exploitation of Premier's Trade Secrets, constitutes an actual, as well as threatened, misappropriation and misuse of Premier's trade secret-protected information under Ohio Revised Code §1333.61, *et seq*.

56. Defendants are liable to Premier for their receipt and exploitation of Premier's Trade Secrets, because, at the times of such disclosures and exploitation, Defendants knew that their awareness of these trade secrets was derived from and through persons who owed duties to Premier to maintain their secrecy, and limit their use.

57. Allegiance is a competitor of Premier. Allegiance serves customers other than Tricor across the United States. By wrongfully obtaining Premier's Trade Secrets, Defendants have obtained an unfair commercial advantage in the marketplace, not only in Tricor's market but throughout the United States as well.

58. Premier is entitled to recover damages from Defendants for the actual losses caused by its trade secret misappropriation. Premier is unable to ascertain, at present, the full extent of the losses suffered as a result of Defendants' conduct, or the extent to which Defendants have been unjustly enriched.

## COUNT II
## COPYRIGHT INFRINGEMENT

59. Premier incorporates the preceding allegations of its Complaint as if rewritten verbatim herein.

60. Premier is the exclusive owner of copyrighted forms for use in its business, including the LPLP Certificate. A true copy of Premier's LPLP Certificate is attached as **Exhibit C**, at 3.

61. Premier registered its copyright with the U.S. Copyright Office and was assigned Registration Number TX7-741-273 (the "'273 Registration"). A true copy of the '273 Registration for the LPLP Certificate is attached as **Exhibit C**, at 1-2. The '273 Registration reflects a date of first publication of June 26, 2012. The '273 Registration is a derivative work of Premier's prior Lifetime Powertrain Program Loyalty Certificate, first published May 1, 2008 and registered with the U.S. Copyright Office as Registration TX 7-673-553 (the '553 Registration). A true copy of the '553 Registration and deposit item is attached as **Exhibit C**, at 4-6. Collectively, the '273 and '553 Registrations are referenced herein as the "Premier Copyrights".

62. Premier developed and created the LPLP Certificate.

63. Premier never granted a license to or otherwise authorized Tricor, Tricor's agents, or Tricor's dealers to use, reproduce, create derivative works from, or distribute the LPLP Certificate outside of their relationship with Premier.

64. Premier never granted a license to or otherwise authorized any party to create derivative works from the LPLP Certificate.

65. Premier never granted a license to or otherwise authorized Defendants to use, reproduce, create derivative works from, or distribute the LPLP Certificate.

13589615v1

66. The replicated form inadvertently sent to Premier (attached hereto as **Exhibit B**, hereinafter, the "Derivative LPLP Certificate") is strikingly similar to the LPLP Certificate owned and registered by Premier and attached hereto as **Exhibit C**.

67. In one pertinent part, the Derivative LPLP Certificate states, under Section 5, "Other Requirements," the following:

> "OTHER REQUIREMENTS. . . . In addition to the maintenance requirements outlined above, within 90 days after the 10 year anniversary of the VEHICLE PURCHASE DATE, and every 5 years thereafter (within 90 days), You are required to confirm that You (a) still own the vehicle; and (b) You have maintained Your vehicle as required. You may submit Your confirmation by certified mail to the following address: Confirmation Dept. PO Box 2082, Dublin, Ohio, 43017, USA."

68. The mailing address in the above paragraph appearing in the Derivative LPLP Certificate of Exhibit B is different from the mailing address in the original LPLP Certificate shown in Exhibit C.

69. On information and belief, Allegiance owns and controls "PO Box 2082" in Dublin, Ohio, and acts as the repository of confirmation notices supplied by customers to vehicle service contracts.

70. On information and belief, Defendants participated in the creation of the infringing form in Dublin, Ohio, including providing directions to the customer regarding the confirmation necessary to obtain the benefits of the program.

71. On information and belief, Defendants or Tricor, distributed the Derivative LPLP Certificate to Tricor dealers without authorization from Premier.

72. On information and belief, Defendants knew or had reason to know that the creation of the Derivative LPLP Certificate, its distribution to Tricor dealers, and its use, copying, and distribution by the Tricor dealers, Tricor, and Defendants in the

13

course of administering a new vehicle service program without Premier's authorization was an infringement of the Premier Copyrights.

73. On information and belief, Defendants actively and materially participated with Tricor in causing or inducing the Tricor Dealers to copy and distribute the Derivative LPLP Certificate in the course of administering vehicle service contracts and Defendants profited thereby.

74. On information and belief, Defendants actively and materially participated with Tricor in infringing other copyrighted works owned by Premier in the course of Defendants' administration of a vehicle service contract program cloned from Premier's Program, the identity of which will be confirmed in discovery.

75. Defendants obtained a direct financial benefit from the infringement of the Premier Copyrights by Defendants, Tricor, and the Tricor Dealers.

76. Upon information and belief, Defendants acts constitute violations of one or more of the following sections of the U.S. Copyright Act:

    a. Defendants engaged in direct infringement of the Premier Copyrights in violation of 17 U.S.C. §106;

    b. Defendants engaged in contributory copyright infringement of the Premier Copyrights by inducing, causing, or materially contributing to the infringing conduct of Tricor and/or Tricor dealers while Defendants knew or should have known the same to be an infringement;

    c. Defendants imported and/or exported infringing copyrighted works in violation of 17 U.S.C. §602(2); and

      d.    Defendants induced, caused, or materially contributed to the violation of 17 U.S.C. §602(2) by conduct of Tricor and/or Tricor dealers while Defendants knew or should have known the same to be a violation.

77.    Defendants' continued activities in violation of Premier's rights in the Premier Copyrights constitute continued copyright infringement.

78.    Defendants' infringement of Premier's exclusive rights was and is willful.

79.    Defendants infringed the Premier Copyrights copyright to obtain a commercial advantage in the market.

80.    As a result of Defendants' acts of copyright infringement and the foregoing allegations, Premier has suffered damages in an amount to be determined at trial and is entitled to statutory damages under the Copyright Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Premier Dealer Services, Inc., prays for judgment against Defendant Allegiance Administrators, LLC, and Defendant Dimension Service Corporation, jointly and severally, as follows:

    A.    Trial by jury on all issues so triable;

    B.    Actual damages in an amount exceeding $25,000;

    C.    Disgorgement per 17 U.S. Code §504(b) of any and all profits resulting from Defendants' wrongful acts;

    D.    An Order directing an accounting per 17 U.S. Code § 504(b) of any and all gains profits and advantages derived directly or indirectly from their use of Premier's copyrighted material;

    E.    At the election of Premier after conducting appropriate discovery, an Order per 17 U.S. Code §504(c)(1), requiring Defendants to pay an amount of statutory damages in an appropriate sum per work infringed;

F. That, based on the Court's finding that Defendants acted willfully, an Order per 17 U.S. Code §504(c)(2), at the election of Premier after conducting appropriate discovery, requiring Defendants to pay an award of increased statutory damages in an appropriate sum per work infringed;

H. An Order per 17 U.S. Code §505 and other law directing Defendants to pay Premier's full cost, legal expenses and reasonable attorneys fees incurred in this action;

I. An Order preliminarily without bond and permanently enjoining Defendants, their agents, representatives, officers, employees, and all those acting in concert therewith, to restrain and enjoin Defendants as set forth herein, including without limitation, regarding: (i) infringement of Premier's copyrights; and (ii) further misappropriation and disclosure of Premier's trade secrets;

J. An Order requiring Defendants to return all Premier's property;

K. An award of punitive damages;

L. An Award of pre- and post-judgment interest; and

M. Such other relief as the Court deems appropriate.

Respectfully submitted,

/s/ Gregory J. Krabacher
Gregory J. Krabacher (0079259)
BRICKER & ECKLER, LLP
100 South Third Street
Columbus, Ohio 43215
(614) 227-2314
(614) 227-2390 (Fax)
Email: GKrabacher@bricker.com

Scott R. Thomas (0061040)
Jason W. Chastang (0091377)
HEMMER DEFRANK WESSELS PLLC
250 Grandview Drive, Suite 500
Ft. Mitchell, Kentucky 41017
Telephone: (859) 344-1188
Fax: (859) 578-3869
Email: sthomas@HemmerLaw.com
jchastang@HemmerLaw.com

*Counsel for Plaintiff*
*Premier Dealer Services, Inc.*

16

13589615v1

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of January, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all parties who have appeared electronically, including without limitation the counsel below. There are no parties who need to be served by manual means.

Christopher W. Tackett, Esq.
Cassandra M. Dohar, Esq.
NARDONE LIMITED
300 East Broad Street, Suite 490
Columbus, Ohio 43215
ctackett@nardonelimited.com
cdohar@nardonelimited.com

                                          /s/ Gregory R. Krabacher
                                          Gregory J. Krabacher (0079259)