# EXHIBIT A

ADMINISTRATION (PROGRAM) AGREEMENT

Between

Tricor Automotive Group, Inc.

and

Premier Dealer Services, Inc.

EFFECTIVE DATE:   October 1, 2014

1

**Exhibit A**

ADMINISTRATION (PROGRAM) AGREEMENT

THIS ADMINISTRATION (PROGRAM) AGREEMENT, including any exhibits attached hereto, (the "Agreement") is between Tricor Automotive Group, Inc. ("TAG"), a corporation incorporated under and governed by the *Canada Business Corporations* Act and Premier Dealer Services, Inc., an Illinois corporation, ("PDS") .

WHEREAS, PDS's businesses include the administering of various vehicle aftermarket products and programs offered to purchasers of motor vehicles in Canada; and

WHEREAS, TAG markets, through its automotive dealer network, consumer/vehicle protection products, certain after market programs including Program Contracts as defined in Section III of this Agreement, including Vehicle Service Agreements (VSA), Mechanical Breakdown Insurance (MBI) and Limited Warranty Programs (LW) under the private label program name "Tricare";

WHEREAS, TAG has secured SAL Marketing Inc ("SAL") to be the obligor for VSC in provinces where it is permitted;

WHEREAS, TAG has secured a Canadian insurance provider ('TAG'S INSURER") incorporated and authorized under An act respecting Insurance L.R.Q. C. A-32, to issue contractual liability policies of insurance to obligors, including SAL and Dealers, insuring the obligations created by selling Program Contracts and to issue certain other insurance policies insuring Program Contract Holders against losses suffered under the terms of Program Contracts (collectively hereinafter referred to as "INSURANCE");

WHEREAS TAG is the administrator of the Program Contracts on behalf of SAL and/or TAG'S INSURER and wishes to subcontract some of these duties including claims handling to PDS;

WHEREAS, TAG also desires PDS to provide analysis and support for pricing adjustments as well as aid in designing Program Contracts from time to time;

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties agree to the following:

I. TERM OF AGREEMENT

This Agreement shall become effective 12:01 A.M. Eastern Standard Time on October 1, 2014 and shall continue through September 30, 2017 ("Initial Term"), unless terminated earlier pursuant to Section IX, TERMINATION, of this Agreement. Upon expiration of the Initial Term, this Agreement shall automatically renew and shall continue in full force and effect until written notice of termination is given by either party, effective twelve (12) months following the date of such notice. Except as provided in Section IX, notice of termination may not be given until after September 30, 2016.

Subject to the terms and conditions of this Agreement, PDS shall serve as the administrator of Program Contracts marketed by TAG and covered by the INSURANCE issued by TAG'S INSURER.

## II. AGREEMENT SCOPE

The PROGRAMS covered by this Agreement include only the PROGRAMS listed below. Additional PROGRAMS may be added upon the mutual acceptance and written agreement of the parties. Current PROGRAMS are as follows:

Vehicle Service Agreements (VSA) are purchased by consumers and provide for mechanical coverage in the event of breakdown of the vehicle.

Mechanical Breakdown Insurance (MBI) are purchased by consumers and provide for mechanical coverage in the event of breakdown of the vehicle.

Mechanical Limited Warranties (MLW) are provided to vehicle purchasers at no charge by dealerships and provide for mechanical coverage in the event of breakdown.

Loyalty Powertrain Products (LP) are dealership giveaway products which promote customer retention and provide for mechanical coverage in the event of breakdown upon meeting various service requirements.

## III. DEFINITIONS

As used in this Agreement, the following terms will have the meanings shown:

"Administration Fees" means the administration fee received by PDS for performing its obligations and responsibilities as required under and pursuant to this Agreement for Program Contracts. Any changes in Administration Fees shall be communicated to TAG in writing at least thirty (30) days in advance of the effective date of the change.

"Broker" means the Canadian licensed insurance broker designated by TAG or TAG'S INSURER for PROGRAMS.

"Claim" shall mean a request for payment or performance of service by a Program Contract Holder in accordance with the terms of a valid Program Contract. A Claim for mechanical repairs or maintenance shall include all repairs and services provided in a single visit to a repair facility.

"CLIP" means and refers to a Contractual Liability Insurance Policy.

"Confidential Information" shall mean this Agreement and all data, trade secrets, trade marks or marks, business information, Programs, Dealer Cost, and any other information of any kind whatsoever that a party herein discloses, either orally or in writing, to the

3

other party. A writing shall include an electronic transfer of information by electronic mail, over the Internet or otherwise.

"Dealer" shall mean an automobile, or similar dealer entity properly licensed in the territory or province where dealer(s) may operate, who provides, markets, sells, solicits and/or issues Program Contracts administered by PDS.

"Dealer Cost" shall mean the amount that the Dealer is required to remit for the sale of each Program Contract.

"Goodwill Expenses" shall mean a claim that is denied by PDS and upon review by TAG's Loss Control, it is determined that the claim should be paid.

"Marketing Fees" shall mean the amount due to TAG for each Program Contract. Such Marketing Fees shall be as determined by TAG for each Dealer and communicated to PDS in writing at least thirty (30) days in advance of the effective date of any change in Marketing Fees.

"MBI Premium" shall mean the amount paid by the consumer for the MBI PROGRAM sold by the Dealer.

"Premium" shall mean amounts paid to TAG's INSURER for coverages insured under the program.

"Premium Refund" shall mean the portion of Premium due to a Program Contract Holder upon cancellation of a Program Contract.

"Program Contract" shall mean a document issued by SAL , TAG'S INSURER, a Dealer or another third party obligor that provides benefits under a PROGRAM.

"Program Contract Holder" shall mean any person or legal entity who holds or acquires the rights to a valid Program Contract as defined herein.

"Program Obligor" means and refers to TAG'S INSURER, SAL, a Dealer or another third party who is obligated under a Program Contract to fund a loss incurred by a Program Contract Holder pursuant to the terms of a Program Contract.

"Reserves" shall mean funds required for Claims. Reserves include:

     (i)    "Base Reserves" which are the minimum amount of funds required for PROGRAM claims; and

    (ii)    "Additional Reserves" which are reserves above the Base Reserves, are to be determined by TAG and/or TAG'S INSURER and may be included on a PROGRAM for an individual Dealer or agent.

4

"TAG'S INSURER Audit Representatives" shall refer to representatives of TAG'S INSURER or TAG'S INSURER'S regulatory authority or Canadian governmental authority who require audit of PDS' records for reasonable protection of their property or interests.

"TAG'S LOSS CONTROL MANAGER" shall mean an individual appointed by TAG.

IV. POLICIES

This Agreement, and the duties to be performed by PDS and TAG as contained herein, are in conjunction with the INSURANCE provided by TAG'S INSURER for the PROGRAMS. To the extent that any terms and conditions of this Agreement conflict with any of the terms and conditions of the INSURANCE, the terms and conditions of the INSURANCE shall prevail.

V. PDS' RELATION TO TAG

This Agreement is not a contract of employment. Nothing herein shall be construed to create the relationship of employer and employee between the TAG and PDS. Subject to the terms of this Agreement, PDS shall be free to exercise judgment and discretion with regard to the conduct of its business. Except as expressly provided herein, the parties do not intend to create a relationship of principal and agent with respect to the PROGRAMS covered under this Agreement, nor do they intend to create a joint venture or partnership and neither party has the right to bind the other or to so represent unless specifically provided herein.

VI. AUTHORITY AND DUTIES OF PDS AND TAG

A.    Sales & Marketing

1.    TAG shall be responsible for the development and production of all marketing and training materials for PROGRAMS. TAG shall ensure that all such marketing and training materials comply with applicable laws and regulations relating to the sale and financing of the PROGRAMS

2.    PDS shall use a standard reference to TAG'S INSURER, which will be provided by TAG in writing, for use in its advertising and promotional materials.

3.    TAG shall train agents and Dealers on all aspects of the Program Contracts.

4.    TAG or its designee will deliver if so requested, contractual liability policies of insurance to respective obligors of the Program Contracts.

5.    TAG shall be responsible for ensuring new Dealers who contract to sell Tricare products meet the underwriting requirements for each PROGRAM. TAG shall collect all Dealer agreements, and dealer

5

appointment documentation (to process appointments in the territory or provinces where Program Contracts will be sold as an insurance product) required by TAG'S INSURER and promptly forward such documentation to PDS and TAG'S INSURER as applicable prior to marketing Program Contracts.

6. Upon TAG'S request, PDS will facilitate Dealer participation in a Dealer reserves program ("Over Remit") and PDS shall manage the program.

B. PROGRAM Management

1. PROGRAMS shall include types and classes of business, policies of insurance and products identified in Section II of this Agreement.

2. TAG shall be assisted by PDS in co-ordinating Programs with TAG'S INSURER and shall be responsible for development of all PROGRAMS including Program Contracts, underwriting and eligibility guidelines, Premium, Reserves, any third party fees and commissions. These amounts plus the Administration Fees set by PDS shall comprise the Dealer Cost.

   a. TAG will provide PDS with advance written notification of the Dealer Cost by Dealer for each PROGRAM. TAG shall further provide a breakdown of the Dealer Cost into the various components.

   b. TAG shall ensure all Program Contracts comply with applicable terms and conditions set for the PROGRAMS with respect to underwriting and pricing. TAG shall submit all Program Contract forms to TAG'S INSURER for advance written approval before use. PDS shall assign a unique form number to each approved Program Contract form.

3. PDS shall manage its administrative rating systems in strict compliance with the set Dealer Cost amounts. PDS shall create rate cards and provide rate cards and/or electronic rating to Dealers which reflect the correct applicable Dealer Cost amount for each PROGRAM.

4. TAG shall notify PDS when a change(s) to the Dealer Cost or any of its components is (are) required. PDS shall have one hundred five (105) days from receipt of the first notice to effect the change, subject to both parties using their best efforts towards the completion of all necessary regulatory filings, if any, required by the request.

5. TAG or its designee shall manage and be responsible for Program Contract and marketing material printing and distribution, to the extent Program Contracts are not delivered electronically.

6.  PDS will be responsible for attaining applicable territory or province approvals required in order to act as an administrator. TAG, SAL, TAG'S INSURER shall obtain any other territory or province approvals required to act as the obligor. Each party shall have responsibility for all fees associated with their respective registrations.

7.  PDS will assist TAG who will be responsible for attaining all necessary lender approvals for its PROGRAMS including any fees associated with these approvals.

8.  All Dealer agreements currently in effect will remain unchanged. TAG shall cause all newly signed Dealers to execute an agreement with TAG or the applicable obligor (the "Dealer Agreement").

9.  PDS shall adhere to all rules, manuals, guidelines, procedures and instructions concerning the PROGRAM as may be prescribed by TAG'S INSURER and communicated to PDS by TAG from time to time.

10. PDS shall report to TAG'S INSURER any claim pursuant to the terms of the associated MBI Policy or CLIP issued by TAG'S INSURER.

11. PDS shall notify TAG and TAG'S INSURER in the event of fraud related to approved Program Contracts.

C.  Finance and Administration

1.  PDS shall collect and process all issued Program Contracts and cancellations of in-force Program Contracts within ninety (90) days of receipt. PDS may at its discretion authorize Dealers to utilize e-contracting for the submission of Program Contracts. In such cases PDS shall require Dealer to email or print and deliver to Program Contract Holders a complete copy of the Program Contract to include registration, enrollment page, coverage terms, conditions and state requirements as may be applicable. TAG, SAL or TAG'S INSURER shall require Dealer to retain copies of all executed Program Contracts and to provide TAG with a hardcopy of the Program Contract upon request.

2.  TAG shall use best efforts to attain approval from TAG'S INSURER to allow PDS to accept Program Contracts that are outside of the normal stated eligibility parameters, under guidelines documented in Program manuals. Until such time as these manuals are developed, PDS may use the eligibility guidelines attached hereto as Exhibit A and incorporated herein by reference.

3.  Program Contracts which cannot be processed for any reason, including those contracts which are ineligible and not within the eligibility guidelines, and for which an exception has not been granted by TAG'S INSURER, shall be returned to Dealer with notices sent to the consumer

7

and lender. PDS shall further use its best efforts to ensure that appropriate refunds are made to consumers and/or the financing lender.

4. For any Program Contract sold by Dealers, TAG shall direct Dealers to send gross payments for Dealer Cost on issued Program Contracts to a segregated lockbox account in a Canadian bank of PDS' choosing that is established only for the Program Contracts insured by TAG'S INSURER ("Deposit Account"). The Deposit Account shall be owned by SAL who shall have responsibility for bank fees. PDS shall have authorization to view on a daily basis, via direct online access, all transactions in order to receive electronic copies of remittances and contracts to process payments and provide reconciliation reporting on the account.

5. PDS will, to the extent permitted by law and subject to the terms and conditions of this Agreement receive and record the Program Contracts.

6. PDS shall pay Marketing Fees to TAG by the 15th day of the month following the month reported to PDS.

7. PDS will manage and process refunds of Dealer Cost through Dealers or direct to consumers and lenders as required for cancellations of Program Contracts. Reserves refund amounts and Premium Refund amounts shall be reconciled and accounted for by PDS in the monthly reporting and true-up process. PDS shall honor any Program Contract Holder's request to cancel that Program Contract Holder's Program Contract in accordance with the terms of the Program Contract. PDS shall promptly pay or cause to be paid to the Program Contract Holder of a cancelled Program Contract the full refund required by the terms of the Program Contract. PDS shall calculate the Premium Refund amount for the cancelled Program Contract to be refunded by TAG and TAG'S INSURER consistent with the Program Contract's terms. TAG instructs PDS to deduct the Premium Refund amounts from the Premium amounts owed to TAG'S INSURER hereunder in its reporting.

8. To the extent PDS is required to make a payment for cancellation refund directly, instead of the Dealer paying the refund and netting the Dealer Cost portion within the remittance process, PDS is hereby authorized to make payment for such refund from a segregated checking account, used exclusively for this purpose only, in a Canadian bank of PDS' choosing, established by SAL and for the Program Contracts insured by TAG'S INSURER ("Cancel Account"). The Cancel Account shall be owned and prefunded by TAG, SAL or TAG'S INSURER, with the account owner responsible for related bank fees. PDS shall have authorization to view and transact on a daily basis, via direct online access, all transactions in order to issue checks, ACH, wire, stop payment and reissue, and provide reconciliation reporting to TAG. Advance funding to open the Cancel Account shall be based on reporting from PDS estimating the amount

8

required for a forty five (45) day period, based on historic data. The Cancel Account shall be replenished no less than monthly based on the actual amount of refunds and fees incurred by the 5th day following TAG's receipt of Cancel detail reporting from PDS. Additional funding will be made in the event the balance is determined to be less than the anticipated disbursements for a two week period. PDS' portion of the refund for its canceled Administration Fees shall be included in the month end accounting report as an amount owed by PDS. TAG will attain approval from TAG'S INSURER that to the extent PDS is obligated to refund an amount which cannot be collected from an out of business Dealer or agent, such amount may be considered a claim under the Program Contract and paid from Reserves.

9.    PDS shall account for payments collected from Dealers and match them to applicable reported Program Contracts. Program Contracts processed for which payment can be accounted and cancellations processed for which refunds were provided shall be considered "Booked Business." The payment for this business shall be considered "Applied Cash" in the month it is applied to a Dealer's Booked Business, regardless of the month in which it is received.

PDS shall be responsible for accounting for and managing over and under payments from Dealers, where the Booked Business does not equal the Applied Cash ("Accounts Receivable"). PDS may attempt to collect such Accounts Receivable from Reserves. PDS shall have the absolute right of offset against any compensation including but not limited to, cancellation payments, Dealer credit balances, claim reimbursements owed to TAG and / or Dealers ("Compensation"), and apply such Compensation against such TAG and / or Dealer's Accounts Receivable balance for the business processed. Under no circumstances, however, shall PDS be held financially responsible for uncollectible Accounts Receivable. In the event of a return of overpayment to the Dealer, PDS will utilize the Cancel Account described above for this payment.

Upon request, PDS shall make available to TAG detailed accounting by Dealer and (if applicable) by PROGRAM of Accounts Receivable balances and detailed accounting with respect to all rights of offset described in this Section VI-C.8.

10.   PDS is hereby authorized to make payments for Claims and Goodwill Expenses from a segregated checking account, used exclusively for this purpose only, in a Canadian bank of PDS' choosing, established by SAL and for the Program Contracts insured by TAG'S INSURER ("Claims Account"). The Claims Account shall be owned and prefunded by TAG, SAL or TAG'S INSURER with the account owner responsible for related bank fees. PDS shall have authorization to view and transact on a daily

9

basis, via direct online access, all transactions in order to issue checks, ACH, wire, stop payment and reissue and provide reconciliation reporting to TAG. Advance funding to open the Claims Account shall be based on reporting from PDS estimating the amount required for a forty five (45) day period, based on historic data. The Claims Account shall be replenished no less than monthly based on the actual amount of Claims, Goodwill Expenses and fees incurred, by the 5th day following TAG's receipt of Claims detail reporting from PDS. Additional funding will be made in the event the balance is determined to be less than the anticipated disbursements for a two week period. Claims payments may include a payment on a credit card used for Claims for TAG Program Contracts. PDS will maintain and control a credit card used exclusively for TAG'S INSURER claim payments. The credit card will be reconciled by PDS biweekly. The biweekly reconciliation will be provided to TAG for immediate biweekly pay-down of credit card, via auto debit from the Claims Account

11. TAG, SAL or TAG'S INSURER shall be responsible for tax compliance including reporting and payment of any premium taxes, Goods & Services Taxes ("GST"), Provincial Sales Taxes ("PST"), Harmonized Sales Taxes ("HST") or any other taxes (collectively "Sales Taxes") related to the Program Contracts. PDS shall provide reporting for such taxes based on the instructions received from TAG, SAL or TAG'S INSURER. PDS' obligation to report and pay such taxes shall be limited to amounts owed by PDS based on its receipt of Administration Fees.

12. TAG or its designee shall pay PDS within two (2) business days of receipt of reporting from PDS on the prior month's processed business. Payment to PDS shall include Administration Fees, Sales Taxes attributable to Administration Fees and payable by PDS, and any payments to third parties TAG desires PDS to make on its behalf including but not limited to Dealers, agents, TAG, and road club or other service providers.

D. Handling of Claims under Program Contracts

1. For all PROGRAMS, PDS shall adjust and settle Claims in accordance with the Claims Procedures attached hereto as Exhibit B.

2. TAG agrees that PDS will approve Goodwill Expenses where the goodwill payment is requested by a Dealer and has been approved by TAG's Loss Control Manager.

E. Reporting and Premium Payment to TAG'S INSURER

1. PDS shall receive transaction details on the Deposit Account and shall provide an accounting summary of cash receipts and Accounts Receivable with a breakdown into Premiums, Reserves, commissions (including

Marketing Fees), and Administration Fees no later than the 15th day of the month following the month in which Program Contracts were reported to PDS in a mutually agreed upon electronic file that includes all information required by TAG'S INSURER.

2. PDS shall provide Cancels detail reporting for the Cancel Account and Claims detail reporting for the Claims Account. The Claims detail reporting is in addition to the bi-weekly Claims reconciliation provided for Claims paid by credit card. This reporting shall be provided no later than the 15th day of the month following the month in which Program Contracts were reported to PDS in a mutually agreed upon electronic file that includes all information required by TAG'S INSURER.

3. PDS shall report to TAG and/or TAG'S INSURER in a mutually agreed upon electronic file the Premium and Reserve details (including written and earned information) by PROGRAM and policy number. SAL shall be responsible for withdrawing Premium and Reserve amounts from the Deposit Account.

F.   General Responsibilities

1.   Quality of Services

PDS shall maintain a staff of competent and trained personnel, systems, supplies and equipment for the purpose of performing PDS' duties under this Agreement and under the terms of Program Contracts.

2.   Representations

Neither TAG nor PDS shall not make any representation verbally or in writing to any Dealer or Program Contract Holder regarding coverage that is inconsistent with the actual terms and conditions of the Program Contract or INSURANCE provided by TAG'S INSURER for PROGRAMS.

3.   PDS' Legal Compliance

a.   PDS shall comply with all laws regulating its performance under this Agreement. PDS shall obtain all administrator or other such licenses and registrations as required by TAG to serve in the role of administrator of the Program Contracts. PDS shall provide to TAG upon request copies of all such licenses or registrations. PDS shall maintain all other licenses, permits and registrations necessary for PDS to be properly engaged in the administration of Program Contracts. In the event a territory or province requires Dealers to maintain a sales representative or other license or registration to solicit the sale of Contracts, TAG shall be responsible for notifying and assuring that all Dealers maintain proper registration or licensure. In the event a territory or province

11

requires Dealers to maintain a sales representative or other license or registration to solicit the sale of MBI or other insurance products, TAG or TAG'S INSURER shall be responsible for notifying and assuring all Dealers and TAG maintain proper appointment, registration or licensure.

b.     PDS shall assume sole responsibility for all fines, fees or penalties assessed against it, which arise out of or relate to its failure to comply with regulatory compliance instructions of TAG or TAG'S INSURER.

c.     PDS acknowledges that TAG is obligated to adopt a privacy policy ("Privacy Policy") of TAG'S INSURER relating to the collection, retention, use, or disclosure of information about its customers and that the PDS may have to apply some or all of those privacy procedures in the exercise of its responsibilities under the Agreement. Accordingly, PDS agrees to follow the Privacy Policy that TAG has adopted, attached as "Exhibit C" hereto, as is relevant to the exercise of such responsibilities.

4.     Expenses

PDS shall pay all expenses related to the performance of PDS's duties under this Agreement, including but not limited to, rentals, transportation, facilities, clerical expense, postage, and miscellaneous expenses. PDS shall not charge or commit TAG to any expense, agreement, payment, debt, or obligation other than the duties of TAG expressly described herein, unless prior written approval is obtained from TAG.

PDS shall pay for all data processing hardware utilized by PDS and shall be responsible for fees for data processing and communication software and technology, including but not limited to, necessary line charges.

5.     Disaster Recovery

PDS will maintain disaster recovery plans which make provision for the prompt and efficient handling of any incident which impairs its ability to perform the obligations required of it by this Agreement. PDS hereby undertakes to periodically test and review its disaster recovery plan for effectiveness. PDS will cooperate fully with TAG to coordinate its disaster recovery program with TAG'S disaster recovery plans with respect to the PROGRAMS. In the event of a disaster, PDS will implement its plan and notify TAG as soon as possible.

VII. PROGRAM INSURANCE AND COMPLIANCE

A.     Insurance

1.     TAG shall secure the proper INSURANCE and the Broker necessary for

TAG'S PROGRAMS as required by the regulatory authorities of the territory, province or locations in which the PROGRAMS are marketed.

2. For the INSURANCE provided by TAG'S INSURER, TAG shall secure certificates and/or confirmation of insurance when necessary or when required by a lender or regulatory authority.

B. TAG'S Regulatory Compliance

1. TAG shall provide PDS with all compliance, laws, rules, regulatory and tax requirement information required to effect the marketing and administration of the PROGRAMS.

2. TAG shall provide assistance in PDS' compliance responsibilities. Such assistance shall include, but shall not be limited to, providing CLIPs from TAG'S INSURER, information and documents necessary to complete regulatory filings on PDS or TAG'S INSURER'S behalf, as well as compliance with laws, rules, regulatory, tax laws and other such requirements.

3. TAG shall notify PDS in writing if TAG becomes aware of any law, regulation or rule in any territory or province that prohibits the distribution of or modifies the PROGRAM, including but not limited to, terms, distribution method or disclosure requirements of approved Program Contracts.

C. TAG'S Legal Compliance

TAG shall operate in compliance with all laws, rules, and regulations, and operate in compliance with all regulatory authorities having jurisdiction. Such compliance shall include, but is not limited to, securing CLIPs and maintaining all licenses, permits and other authorizations legally required for it to operate as a marketer in all territories or provinces in which TAG does or will market PROGRAMS.

TAG shall assume sole responsibility for all fines, fees or penalties assessed against it, which arise out of or relate to its performance under this Agreement.

D. Insurance Maintained by TAG

During the term of this Agreement, TAG shall provide proof of and maintain insurance as required by law in the provinces or territories where TAG engages in or does business pursuant to this Agreement. A certificate of insurance or a certified copy of each policy of insurance shall be furnished to PDS upon request. TAG agrees that not less than thirty (30) days prior to the expiration of any insurance required by this Agreement, it will furnish to PDS a certificate of insurance or a certified copy of each renewal policy to cover the same risks. All

13

policies for insurance shall provide by appropriate language that PDS is an additional insured.

E.    Expenses

TAG shall pay all expenses related to the duties or performance of TAG under this Agreement. TAG shall not charge or commit PDS to any expense, agreement, payment, debt, or obligation other than expressly described herein unless prior written approval is obtained from PDS.

TAG shall pay for all data processing hardware utilized by TAG and shall be responsible for fees for data processing and communication software and technology, including but not limited to, necessary line charges.

VIII. MAINTENANCE OF RECORDS; ACCESS TO RECORDS

A.    PDS shall maintain complete records of all transactions pertaining to Program Contracts written pursuant to this Agreement. Such records may be in electronic format or media and shall be maintained for a period of time in accordance with regulatory record retention requirements, but in no event less than seven (7) years following the expired term of the Program Contracts. PDS shall provide reasonable access to TAG'S INSURER Audit Representatives at any time required by such representatives.

B.    TAG shall make available all books and records maintained by TAG relating to the business produced hereunder for examination and review by any authorized representatives of PDS.

C.    When the PROGRAM transactions are recorded on PDS's proprietary data processing system(s), PDS shall, no less than weekly, back-up records of all transactions. PDS shall maintain the backup records at a location other than the location where original records are maintained and shall notify TAG of such location.

D.    In lieu of maintaining physical copies of the records described hereunder, PDS may keep said records in a form of electronic media of its choosing and shall advise TAG with respect to same.

IX. TERMINATION

A.    Upon the expiration of this Agreement, a full and final accounting for all Premiums due TAG'S INSURER for all Program Contracts sold by TAG and Dealers shall be completed by PDS within 90 days after such termination and TAG shall have access to any and all bank accounts held in the name of PDS pursuant to the terms of this agreement and to any and all accounting records with respect thereto.

14

B.   TAG may terminate this Agreement if PDS breaches any material provision of this Agreement as follows:

    1.   In the event of such material breach, TAG shall:

        a.   Notify PDS in writing of the material breach, specifying in detail the alleged breach and stating that such breach is grounds for termination, and

        b.   Provide PDS thirty days (30) days, from the receipt of the notice of material breach, to cure such breach.

        c.   In the event additional time is needed by PDS to cure the breach due to circumstance beyond its control, TAG will grant such additional time as may be reasonably necessary. Such grant of extension of time will not be unreasonably withheld by TAG.

    2.   If the material breach is not cured within thirty (30) days, or in accordance with subsection c) above, TAG may immediately exercise its right of termination by providing PDS written notification thereof. Termination shall be effective thirty (30) days following the date of such notice.

C.   PDS may terminate this Agreement, if TAG breaches any material provision of this Agreement.

    1.   In the event of such material breach, PDS shall:

        a.   Notify TAG in writing of the material breach specifying in detail the alleged breach and stating that such breach is grounds for termination, and

        b.   Provide TAG thirty (30) days, from the receipt of the notice of breach, to cure such breach.

        c.   In the event additional time is needed by TAG to cure the breach due to circumstance beyond its control, PDS will grant such additional time as may be reasonably necessary. Such grant of extension of time will not be unreasonably withheld by PDS.

    2.   If the material breach is not cured within thirty (30) days, or in accordance with subsection c) above, PDS may immediately exercise its right of termination by providing TAG written notification thereof. Termination shall be effective thirty (30) days following the date of such notice.

D.   If any of the following events occur, then this Agreement shall terminate immediately upon written notice from one party to the other:

    1.   A party makes an assignment for the benefit of a receiver or liquidator is

15

appointed for a party or a substantial part of its property; or insolvency, bankruptcy, reorganization, arrangement or similar proceedings are instituted by or against a party.

2.    A party mishandles or misappropriates any funds or property of the other party or TAG'S INSURER, unless such funds are repaid or refunded within fifteen (15) days following written notice from the other party.

3.    A party abandons or discontinues its business or commits a fraudulent act.

E.    Notwithstanding any provision contained in this Agreement, after September 30, 2016, either party may terminate this Agreement by providing twelve (12) months advance written notice thereof to the other party.

F.    Upon termination, expiration or cancellation of this Agreement:

PDS and TAG agree to continue to perform all functions and obligations required by this Agreement as if this Agreement were in full force with respect to all Program Contracts with effective dates prior to the termination or expiration date of this Agreement. Such service shall continue until all Program Contracts expire or are canceled and all Claims have been paid or a mutually acceptable arrangement for the fulfillment of such obligations is evidenced by a written agreement between the parties.

G.    The following provisions shall survive termination of this Agreement and will remain in effect until any Program Contracts and/or related financing instrument or PROGRAMS terminate or expire:

Sections VI, to and including XXVII.

X. RIGHT OF OFFSET

All amounts that TAG may be required to pay to PDS or its PDS owned affiliates shall be subject to TAG'S right to set off any amounts, which PDS and/or its PDS owned affiliates do not dispute is owed to TAG or its affiliates by PDS and/or its affiliates.

All amounts that PDS or PDS owned affiliates may be required to pay to TAG and/or its affiliates shall be subject to PDS' right to set off any amounts owed to PDS or its affiliates by TAG and/or its affiliates, the owed amount to PDS which TAG and/or its affiliates do not dispute.

Any offset by either party shall be permitted only upon thirty (30) days advance written notice to the other party(s). Such advance written notice must include validation of the owed amount, justifying such offset.

XI. CONFIDENTIALITY

A.     During the term of this Agreement and at all times thereafter, regardless of the cause for termination, TAG may receive Confidential Information of PDS either orally or in writing. TAG agrees it shall keep all Confidential Information of PDS confidential. However, TAG may disclose Confidential Information of PDS in the event of termination of this Agreement, but only to the extent necessary, and provided that the other party to such disclosure agrees to be bound by the terms of this Section XI. TAG may also disclose Confidential Information:

 1.     To such TAG directors, officers, employees and other authorized personnel (hereinafter collectively referenced as "TAG Representatives") of TAG, in order for TAG to fulfill its obligations under this Agreement and related Insurance. Such TAG Representatives shall be advised by TAG of the confidential nature of such information and shall agree to maintain the confidentiality of the information;

 2.     To the extent that PDS provides its prior written approval of such disclosure; and/or

 3.     To the extent that TAG, or any TAG Representative, is legally required to make such disclosure, provided that, PDS is notified in writing by TAG ten (10) days prior to making the disclosure. In such case or cases, TAG or any TAG Representative, agrees to disclose only that Confidential Information which is required by law, regulations or an administrative body.

B.     During the term of this Agreement and thereafter as may be required to fulfill the terms and conditions of this Agreement, either orally or in writing. PDS may receive Confidential Information of TAG. PDS agrees it shall use all reasonable efforts to keep all Confidential Information of TAG confidential. However, PDS may disclose Confidential Information of TAG:

 1.     To such PDS directors, officers, employees and other authorized personnel (hereinafter collectively referenced as "PDS Representatives") of PDS, in order for PDS to fulfill its obligations under this Agreement. Such PDS Representatives shall be advised by PDS of the confidential nature of such information and shall agree to maintain the confidentiality of the information;

 2.     To the extent that TAG provides its prior written approval of such disclosure; and/or

 3.     To the extent that PDS, or any PDS Representative, is legally required to make such disclosure, provided that, TAG is notified in writing by PDS ten (10) days prior to making the disclosure. In such case or cases, PDS or any PDS Representative, agrees to disclose only that Confidential Information which is required by law, regulations or an administrative

17

body.

C.   TAG agrees that it shall include in its agreements with SAL and TAG's Insurer that Confidential Information disclosed to these parties about PDS shall be protected by the party to the same extent TAG is required in this Agreement.

D.   Upon termination or cancellation of this Agreement, TAG and PDS agree not to disclose Confidential Information thereafter to any person at any time except as strictly required to perform the services described in this Agreement.

## XII. REPRESENTATIONS AND INDEMNITY

A.   Each party represents and warrants:

1.   It is a duly organized corporation, validly existing and in good standing under the laws of its state, territory or province of incorporation and has: (1) all necessary licenses, authorizations, registrations, and approvals; and (2) full power and authority to carry out its business as it is presently being conducted and as required in order to consummate the transactions contemplated by this Agreement.

2.   It has the corporate power to enter into this Agreement and to perform its obligations hereunder, and the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate actions, and constitute legal, valid, and enforceable actions.

3.   All of its forms, policies and procedures comply with, and its business is conducted in accordance with, all applicable laws and regulations, to the best of such party's knowledge and belief.

4.   The execution and delivery of this Agreement and performance of its obligation under this Agreement is not in conflict with any provision of law or any agreement, instrument or document, or any court order, or other ruling binding upon it.

5.   Neither party to this Agreement is directly or indirectly:

a.   bound by any decree, judgment, order, writ, injunction, finding or determination, whether formal or informal, of any court, tribunal or governmental agency or body of any kind; or party to any pending case, court, tribunal or any governmental agency or body of any kind, whether actual or threatened, which, upon an adverse finding, might prevent the performance of any material duty in respect to the transactions contemplated by this Agreement.

b.   bound by any agreement with anyone which will prevent the performance of any material duty in respect to the transactions contemplated by this Agreement.

18

B.   TAG agrees to indemnify, defend and hold PDS, its affiliates, directors, officers, agents, representatives and employees harmless from and against any and all claims, suits, actions, liability, losses, expenses or damages, including compensatory, punitive and exemplary damages and reasonable attorney fees ("Losses"), now existing or which hereafter arise caused by or resulting from any of the following:

   1.   Any wrongful act by TAG, SAL or TAG'S INSURER or any of their affiliates, directors, officers, agents, representatives and employees;

   2.   The failure of TAG, SAL or TAG'S INSURER or any of their affiliates, directors, officers, agents, representatives and employees to comply with any material law or regulation regardless of whether such failure was intentional or unintentional, or resulted from mistake, negligence or lack of knowledge;

   3.   Any inaccuracy in or any breach of any representation, warranty, covenant or agreement of TAG contained in this Agreement or in any agreement, document or certificate delivered in connection herewith;

   4.   Any Losses incurred which TAG, SAL, or TAG'S INSURER caused;

   5.   The failure of TAG to provide to PDS all compliance, laws, rules, regulatory information needed in connection with any regulatory filing or other such form of compliance required to effect the administration of the PROGRAM, including but shall not be limited to, compliance laws, rules, requirements and rules of SAL and TAG's INSURER, regulatory information, tax rules and other such requirements;

   6.   Any permissions granted to PDS by TAG on behalf of SAL or TAG'S INSURER.

C.   In exchange for TAG protecting PDS, PDS shall notify TAG promptly of any claim against PDS. PDS shall also allow TAG to complete a reasonable investigation or defense of such claim. However, PDS shall have the right, at its sole cost and expense, to participate jointly with TAG in the defense of any claim, demand, suit or other proceeding in connection with such claim for which indemnification is made and no such claim, demand, suit or other proceeding may be settled or otherwise compromised without the consent of both TAG and PDS.

D.   PDS agrees to indemnify, defend and hold TAG, its affiliates, directors, officers, agents, representatives and employees harmless from and against any and all claims, suits, actions, liability, losses, expenses or damages, including compensatory, punitive and exemplary damages and reasonable attorney fees ("Losses"), now existing or which hereafter arise caused by or resulting from any of the following:

19

1. Any wrongful act by PDS, or any of its affiliates, directors, officers, agents, representative and employees;

2. The failure of PDS or any of its affiliates, directors, officers, agents, representatives and employees to comply with any material law or regulation regardless of whether such failure was intentional or unintentional, or resulted from mistake, negligence or lack of knowledge;

3. Any inaccuracy in or any breach of any representation, warranty, covenant or agreement of PDS contained in this Agreement or in any agreement, document or certificate delivered in connection with this Agreement;

4. Any fraudulent or unauthorized use of the claims disbursement account and the claims deposit account required to be maintained pursuant to this Agreement;

5. Any Losses incurred which PDS caused.

E. In exchange for PDS protecting TAG, TAG shall notify PDS immediately of any claim against TAG. TAG shall allow PDS to make any reasonable investigations, settlement or defense PDS feels is appropriate. However, TAG shall have the right, at its sole cost and expense, to participate jointly with PDS in the defense of any claim, demand, suit or other proceeding in connection with such claim for which indemnification is made and no such claim, demand, suit or other proceeding may be settled or otherwise compromised without the consent of both PDS and TAG.

## XIII. NO WAIVER

The failure of TAG or PDS to insist on strict compliance with this Agreement, or to exercise any right or remedy hereunder shall not constitute a waiver of any rights contained herein nor prevent the parties from thereafter demanding full and complete compliance therewith, nor prevent the parties from exercising such remedy in the future.

## XIV. FULL AGREEMENT

This Agreement shall take precedence in the event of conflict between this Agreement and any and all previous agreements covering the subject matter herein, whether written or oral, between TAG and PDS or their predecessors with respect to the type of business to be written hereunder. Except as otherwise provided herein, no amendment to this Agreement shall be valid unless in writing, and signed by the parties hereto.

## XV. SEVERABILITY

Wherever possible, each provision of this Agreement shall be interpreted in such manner and to such an extent as to be effective and valid under applicable law. If any provision is

prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity.

## XVI. THIRD PARTY BENEFICIARIES

The provisions of this Agreement are for the sole benefit of the parties and, except as otherwise provided in Section XII. INDEMNITY, neither party shall be liable to any person not a party hereto for loss, liability, damage, expense or for any claim whatsoever.

## XVII. NOTICES

A.   Any demand, notice or other communication (hereunder in this Section XVII referred to as a "Communication") given in connection with this Agreement shall be in writing and shall be deemed duly given if delivered by certified or registered mail, delivered personally or by overnight delivery service, signature required, or by facsimile or electronic mail or any other method now known or hereinafter invented for transmitting written telecommunications in legible and permanent form addressed to the party for whom it is intended at the following address or such other address as the recipient may designate from time to time.

| | |
|---|---|
| For PDS: | Premier Dealer Services, Inc.<br>555 Metro Place North, Suite 650<br>Dublin, Ohio 43017<br>Attention: A. Kurt Wolery, Senior Vice President<br>Facsimile:  888-761-9552 |
| With a copy to: | Carlo R. Wessels, J.D., L.L.M.<br>250 Grandview Drive, Suite 500<br>Ft. Mitchell, Kentucky 41017 |
| For TAG: | Tricor Automotive Group, Inc.<br>3003 E. 98th Street, Suite 207<br>Indianapolis, IN 46280<br>Attention: Joseph Campbell, President<br>Facsimile: 800-507-1007 |
| With a copy to: | Peter Harris<br>330 Bay Street, Suite 505<br>Toronto, ON M5H 2S8<br>Facsimile:  416-214-6055 |

B.   Notice given by personal delivery or by overnight delivery service, signature

required shall be conclusively deemed to have been given on the day of actual delivery thereof and, if given by certified or registered mail on the fifth Business Day following the deposit thereof in the mail, and if given by facsimile or electronic mail or by another electronic means on the day of transmittal thereof, or if the party giving a Communication hereunder knows or ought reasonably to know of any difficulties with the postal, courier or electronic system which might affect the delivery of notice hereunder, any such Communication shall be deemed not to have been delivered until the first day such delivery medium is reasonably available to use.

## XVIII. APPLICABLE LAW

This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein. Each party consents to the jurisdiction of and agrees that any disputes under this Agreement shall be determined in the applicable courts of the Province of Ontario.

## XIX. CAPTIONS

The captions of this Agreement are not part of the Agreement, but are merely for reference and should have no force or effect. If any caption is inconsistent with any provision of the Agreement, such provision shall govern.

## XX. CONTINUED PERFORMANCE

Each party agrees that it will, unless otherwise directed by the other party, continue performing its obligations (other than such party's obligation to pay amounts disputed in good faith) under this Agreement while any dispute is being resolved, unless and until this Agreement expires or is terminated in accordance with its terms.

## XXI. COUNTERPARTS

This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

## XXII. FURTHER ASSURANCES

Each party covenants and agrees that, subsequent to the execution and delivery of this Agreement and without any additional consideration, each party will execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement.

## XXIII. FORCE MAJEURE

No party shall be held liable or responsible to the other party nor be deemed to have defaulted under or breached the Agreement for failure or delay in fulfilling or performing

any term of the Agreement to the extent, and for so long as, such failure or delay is caused by or results from causes beyond the reasonable control of the affected party including, but not limited to, fires, earthquakes, floods, embargoes, wars, acts of war (whether war is declared or not), insurrections, riots, civil commotions, strikes, lockouts or other labor disturbances, acts of God or acts, omissions or delays in acting by any governmental authority or other party. This provision shall not apply to payment obligations of the parties.

## XXIV. ASSIGNMENT

If there is a change in ownership of PDS, which is defined as the transfer directly or indirectly of more than fifty percent (50%) of the voting control of PDS, PDS may assign this Agreement. TAG shall not object unless:

A.  Assignee has a felony or fiduciary criminal background; or has an outstanding or unresolved issue with a state, territory, province or insurance regulatory authority;
B.  Assignee has been terminated previously by TAG, or otherwise ended a prior relationship;
C.  Assignee is a competitor of TAG; or
D.  Less than fifty percent (50%) of current management is maintained for a period of one hundred and eighty (180) days from the date of such assignment.

In the event that there is a change in ownership of PDS and TAG objects to the assignment based on paragraphs, C or D, TAG may notify PDS in writing of its objection and provide three hundred and sixty five (365) days advance written notice of termination. In the event that there is a change in ownership of PDS and TAG objects to the assignment based on paragraphs A or B, TAG may notify PDS in writing of its objection and provide one hundred and eighty (180) days advance written notice of termination.

Except as specifically provided for under the assignment provisions of the ancillary or related agreements between PDS and TAG, upon assignment of this Agreement, all of the ancillary or related agreements between PDS and TAG shall also be assigned.

## XXV. DISPUTE RESOLUTION

The parties will work together in good faith to resolve any and all disputes between them (hereinafter referred to as "Dispute") including, but not limited to, all questions of the existence, validity, scope or termination of this Agreement, or any term thereof. If the parties are unable to resolve any Dispute by working together in good faith, they may do so by way of litigation.

## XXVI. CURRENCY

The Parties agree that all dollar amounts referenced in this Agreement shall be in Canadian Dollars.

23

## XXVII. ENGLISH LANGUAGE

The Parties agree that it is their express wish that this Agreement, its schedules, exhibits and incidental documents be drawn up in the English language. Les parties aux présentes conviennent et affirment qu'il est de leur volonté expresse que le présent traité, ses annexes et ses accessoires soient rédigés en langue anglaise.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by the respective officers duly authorized to do so.

Tricor Automotive Group, Inc.

BY: _____

NAME:  Joseph L. Campbell

TITLE:  President

Premier Dealer Services, Inc.

BY: _____

NAME:  A. Kurt Wolery

TITLE:  SR VP Legal

24

## EXHIBIT A

## ELIGIBILITY GUIDELINES

### Exception History

All Contract Exceptions are maintained in a sortable log – All requests flow through a Senior Administration Supervisor. Decisions emanate from his point person.

### Exception Variables Considered

Dealer Production Inception to date
Dealer Production last 18 months
Dealer Loss Ratio Inception to date vs. Product Loss Ratio Inception to date
Dealer Loss Ratio last 18 months vs. Product Loss Ratio last 18 months
Exception Vehicles Loss Ratio Inception to Date
Exception Vehicles Loss Ratio last 18 months
Variance of the Request (#of miles, number of years etc.) checked for reasonableness
A count of the approved exceptions for this dealer vs. the dealer overall production. The system will verify that the number of exceptions do not exceed 1% of total contract production.
**Note: -** Exceptions for ineligible vehicles are not considered

### Factors Considered and Scored

These factors are scored and cumulative score is either positive or negative

Negative scores result in a denied exception – a letter or email to the dealer is sent. The denial letter simply states that the vehicle does not qualify for the coverage based on the following reason(s).

### Exception Amount Calculation if Approved

Minimum Claim Reserve amount is added

Minimum amount of 25% of claim reserve calculated as exception reserve amount

Overview: The Exception Scoring system disallows exceptions for poorly performing dealers, or poorly trending dealers, poorly performing vehicles and dealers that request too many exceptions. When exceptions are approved – the claim reserve deviation generally far exceeds a calculated typical rate if it existed for the request. Exceptions deal with requests that exceed the boundaries of eligibility only – and not simply to gain higher coverage – when the vehicle is eligible for lesser coverage. TAG's Senior management will be contacted if a denial of an exception on a Program contract becomes contested by the contract holder through counsel or a regulatory body.

*Typical exceptions are vehicles that exceed the eligible model years – but are eligible by odometer and conversely vehicles that exceed the odometer limits, but are within the model year eligibility – or vehicles that slightly exceed both parameters.*

25

**EXHIBIT B**

**SEE ATTACHED.**

## CLAIMS PROCEDURES

All capitalized terms used in the Claims Procedures ("Procedures") shall have the meanings attributed to them in the Administration (Program) Agreement to which these Procedures are attached.

These PDS' Procedures apply to the following PROGRAMS: VSA, MLW, LP and MBI. The responsibilities of PDS and the rights of TAG set forth herein shall be in addition to those responsibilities and duties of PDS and TAG in the Administration (Program) Agreement.

I.   **RESPONSIBILITIES AND DUTIES OF PDS**

A.   PDS agrees to maintain written claims procedures to timely and promptly settle claims arising out of the Program Contracts pursuant to the terms and conditions of the Program Contracts.

B.   PDS shall report all claims data on a monthly basis in a mutually acceptable format. At TAG'S request and expense, PDS shall make copies of any Claim file.

C.   PDS may pay claims with a PDS provided credit card account. All credit card rebates for such account shall be the exclusive property of PDS.

D.   PDS shall notify TAG of the following:

(1) any lawsuit received by PDS in which TAG, SAL or TAG'S INSURER is named as a defendant or in which PDS is named as a defendant where the complaint is associated with a TAG product; or

(2) any communication by any regulatory agency related to a TAG product.

Such notices shall be emailed or faxed to TAG, within 48 hours of receipt, at the following address and fax number:

For TAG:                Tricor Automotive Group, Inc.
                        3003 E. 98th Street, Suite 207
                        Indianapolis, IN 46280
                        Attention: Joseph Campbell, President
                        Facsimile: 800-507-1007


With a copy to:         Peter Harris
                        330 Bay Street, Suite 505
                        Toronto, ON M5H 2S8
                        Facsimile: 416-214-6055

27

TAG shall be entitled to handle, at its sole cost and expense, any such complaint in which TAG, SAL or TAG'S INSURER is specifically named. TAG shall advise PDS of its intent to handle the lawsuit or complaint within 48 hours of receipt. A copy of TAG's response shall be provided to PDS for documentation.

E.  PDS shall store all files for 7 years from the date of closure. Such files may be stored in electronic format.

## II.  SPECIAL CLAIMS PROCEDURE

A. PDS will provide notice to TAG prior to settling any claim exceeding $10,000 per Program Contract claim file ("Large Claim").

B. TAG acknowledges that PDS shall have the authority to make goodwill Claim PROGRAM payments pursuant to standards described in the Agreement with respect to goodwill expenses.

## III.  EXPENSES

A.  PDS shall make all payments from the Claims Account for expenses relating to Claims under the PROGRAMS, including but not limited to, the following:

1. Attorney's fees, lawsuit or arbitration settlement expenditures, and disbursements;

2. Court reporter services and transcripts;

3. Stenographic services and transcripts;

4. Witness attendance fees;

5. Court costs;

6. Appeal bonds;

7. Printing costs related to trials and appeals;

8. Testimony, opinions, appraisals, reports, surveys, and analysis of professionals and experts;

9. Trial and hearing attendance fees;

10. Reports from government agencies and branches;

11. Credit bureau reports;

12. Private investigators;

13. Photographs; and

14. Extraordinary Claim investigation and/or travel expense incurred at the request of TAG.

15. Laboratory Testing or Analysis Fees

B.    PDS shall be solely responsible for and pay all unallocated expenses, exclusive of indemnity payments made in the settlement of Claims, necessary in the performance of PDS's duties under this Agreement.  Such expenses shall include, but are not limited to, PDS employee salaries, rentals, transportation expenses, postage, data processing charges, adjuster licensing fees, adjuster fees, occupational taxes, and income taxes.

**EXHIBIT C**

**SEE ATTACHED**.



**INDUSTRIELLE ALLIANCE**
ASSURANCE ET
SERVICES FINANCIERS INC.

**INDUSTRIAL ALLIANCE**
INSURANCE AND
FINANCIAL SERVICES INC.

### PRIVACY POLICY FOR THE INDUSTRIAL ALLIANCE GROUP

The Industrial Alliance Group is composed of Industrial Alliance Insurance and Financial Services Inc. and its subsidiaries ("we/us"). Together, we are committed to protecting our clients', employees' and representatives' ("you/your") privacy, and to ensuring the confidentiality of the personal information provided to us in the course of our business.

Our Privacy Policy sets out our standards for collecting, using, disclosing and storing your personal information. Our Privacy Policy also explains how we safeguard your personal information and your right to access that information.

### PERSONAL INFORMATION

Personal Information is any information about an individual that identifies him or her, such as financial, lifestyle or health information, but not their name, title or business address, telephone or email.

Personal information has to be protected regardless of its characteristics or its form, whether written, graphic, audio, visual, computerized or any other form.

### PURPOSE OF INFORMATION COLLECTION

Collecting information about you is necessary in order for us to provide you with high quality services. The nature and sensitivity of the information we collect about you varies according to the services we provide you and to legal requirements imposed on us (such as your social insurance number, where investment income is generated by a chosen product).

The purposes for which we collect personal information about you are identified at or before the time of collection. For example, information may be collected while submitting an application, opening an account, or submitting a claim.

Purposes for collecting information generally include providing products or services requested, confirming your identity, protecting against fraud, or dealing with matters concerning the relationship between us.

Any questions and concerns you may have regarding the purposes for collecting information may be directed to us at the address provided below.

## CONSENT

When we collect personal information from you, we obtain your consent to use the information for the purposes collected. We will obtain your consent for any additional use or collection, or if the purpose of using the information is changed.

We generally seek your express written consent in order to collect, use or disclose personal information. Where appropriate, for less sensitive information, we may accept your verbal consent. Occasionally, we may imply consent where we can infer consent from your action or inaction.

Consent must be given by you or your authorized representative such as a legal guardian or a person having power of attorney.

You may withdraw your consent at any time, subject to legal or contractual restrictions (for example, your right to withdraw consent is necessarily limited where we need information to extend a loan against the value of a policy issued by us). We will inform you of the consequences of such withdrawal, including the possibility that we may not be able to provide a product or process a request. If you choose not to consent, we will record the decision in our file.

In limited circumstances, we have the right (or obligation) to collect, use or disclose personal information without your knowledge and consent. This occurs when legal, medical, or security reasons may make it impossible or impractical to seek consent. When information is being collected for the investigation of a potential breach of contract, the prevention or detection of fraud, or for law enforcement purposes, seeking consent might defeat the purpose of the information collection. Similarly, seeking consent may be impossible or inappropriate when you are a minor, seriously ill or otherwise incapacitated.

## LIMITS TO COLLECTION, USE AND DISCLOSURE

We limit the collection of your personal information to what we need in relation to the purposes identified to you.

We collect the information directly from you unless you allow us to collect information from a third party or in accordance with the law.

We limit the use of your personal information to the purposes we have identified to you. This means that we cannot use your personal information for other purposes without your consent, except as required by law.

We cannot disclose your personal information to anyone except with your consent or as required by law.

Your personal information is only accessible to certain authorized persons, and only to the extent necessary to perform their duties.

You have the right to know, on request, to whom the information was disclosed. Only in rare instances are we prevented by law from making such disclosure. We maintain accurate records, recording to whom we disclose personal information and in what circumstances it was disclosed.

We will occasionally share your personal information with service providers or agents to ensure the proper administration of products, or to provide you with the services you require. These service

providers or agents must agree to comply with privacy legislation before receiving any personal information.

In certain circumstances, we may use service providers outside Canada, including the United States. We are responsible for the service provider's compliance with our Privacy Policy and will ensure that the level of protection of personal information is comparable to that provided by us. Any questions concerning the collection, transfer or use of personal information outside Canada can be forwarded to the Privacy Officer at the address provided below.

## RETENTION

We only retain your personal information for as long as needed for the purpose it was collected. We must destroy this information in accordance with the law and our file retention guidelines. When we destroy your personal information, we make sure that confidentiality is secured and that no unauthorized person can access the information during the destruction process.

## CLIENT LIST

We may establish a list of clients (names, addresses and telephone numbers) and share this list with other companies of the Industrial Alliance Group. The purpose of this list is to allow us to better serve you by offering relevant and available products and services. You may request that your name be removed from such a list by writing to the Privacy Officer at the address provided below.

We do not sell client lists to third parties.

## ACCURACY

We make every possible effort to ensure that your personal information is as accurate and complete as necessary for the purposes it is collected, used, or disclosed.

## ACCOUNTABILITY

We are responsible for your personal information in our possession or control, including information that may be transferred by us to third parties for processing. We require such third parties to keep personal information under strict standards of privacy and protection.

We adhere to legislated and self-imposed rules, aimed to safeguard your privacy. The rules are established by this Privacy Policy, the Code of Business Conduct (applicable to directors, officers and employees), Market Conduct Standards (applicable to agents and brokers) as well as insurance industry guidelines and applicable law.

Our staff is trained on these processes and procedures and is provided with information about privacy laws.

## SAFEGUARDS

We have implemented and continue to implement rigorous safeguards so that your personal information remains strictly confidential and is protected against loss or theft, as well as unauthorized access, disclosure, copying, use, or modification.

Protection methods include organizational measures such as requiring security clearances and limiting access to a "need-to-know" basis, physical measures (e.g. building access cards for employees, visitor registration and identification cards, off-site backups and archiving), and technological measures such as the use of password and encryption (e.g. the use of routinely changing passwords, firewalls and segmented operator access).

## REQUEST FOR ACCESS TO INFORMATION AND AMENDMENTS

You have the right to be informed whether we hold personal information about you and to see that information. You also have the right to enquire as to how we collected your information, how we used it and to whom it may have been disclosed.

This information will be provided to you within a reasonable time from the date we receive your written request. We may charge a reasonable fee for processing your request.

In certain limited and specific circumstances, we may refuse to provide to you the requested information. Exceptions to your access right can include information that is prohibitively costly to provide, information that contains references to other individuals, information that cannot be disclosed for legal, security or commercial proprietary reasons, information that has been obtained in the course of an investigation of a potential breach of contract or fraud, and information that is subject to solicitor-client or litigation privilege.

In cases where we hold medical information about you, we may refuse to provide you with direct access to this information and may instead request that a health care professional be designated to provide the information to you.

You may challenge the accuracy and completeness of your personal information. We will respond to an amendment request within a reasonable time.

Any request for access to information or request for amendment must be sent to the following address:
Privacy Officer
Industrial Alliance Insurance and Financial Services Inc.
1080 Grande Allée West
PO Box 1907, Station Terminus
Québec (Québec) G1K 7M3

**COMPLAINTS AND CONCERNS**

Our employees and representatives are trained to respond to your questions or concerns about personal information. Should you be unsatisfied with our employee's or representative's response, you may contact the Privacy Officer at the address mentioned above.

A complaint concerning the protection of personal information should be addressed to the Privacy Officer at the address provided above.

### ADDENDUM No. 1

to the Administration Agreement ("Agreement") entered into between

Tricor Automotive Group, Inc. ("TAG")
and
Premier Dealer Services, Inc. ("PDS")

with the original Agreement having an effective date of October 1, 2014

WHEREAS, TAG is the administrator of the Program Contracts (as defined in the Agreement) on behalf of SAL Marketing Inc. ("SAL") and/or TAG'S insurer and subcontracts some of these duties including claims handling to PDS;

WHEREAS, TAG secured SAL to be the obligor for the Program Contracts, that included Vehicle Service Agreements ("VSA");

WHEREAS, TAG will replace SAL as the obligor for the VSA.

IT IS HEREBY AGREED that effective as of ___July 1st___, 2015 the Agreement is modified as follows:

1.) TAG will hereby replace SAL as the obligor for VSA and will be responsible for the obligor responsibilities as set out in the Agreement and in the VSA. SAL will remain responsible for the obligations as set out in the Agreement and in the VSA that were incurred prior to the effective date of this Addendum No. 1. TAG and SAL will be responsible to make all of the necessary arrangements for the transition of the obligor status to TAG.

2.) The following section VI. E (3) is hereby deleted:

> PDS shall report to TAG and/or TAG'S INSURER in a mutually agreed upon electronic file the Premium and Reserve details (including written and earned information) by PROGRAM and policy number. SAL shall be responsible for withdrawing Premium and Reserve amounts from the Deposit Account.

and is replaced with the following:

> PDS shall report to TAG and/or TAG'S INSURER in a mutually agreed upon electronic file the Premium and Reserve details (including written and earned information) by PROGRAM and policy number. SAL or TAG'S INSURER shall be responsible for withdrawing Premium and Reserve amounts from the Deposit Account.

Except as specifically modified herein, the terms and conditions of the above referenced Agreement shall remain unaltered and in full force and effect.

Signed on behalf of the parties as set out below, each a signatory warranting that he has the authority to do so:

**Tricor Automotive Group, Inc.**

By: _____

Name: Joseph L. Campbell

Title: President

Date: July 1, 2015

**Premier Dealer Services, Inc.**

By: _____

Name: A.Kurt Wolery

Title: SRVP Legal

Date: 8/14/15