UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

PREMIER DEALER SERVICE, INC.,

     Plaintiff,

     v.

ALLEGIANCE ADMININSTRATORS,
LLC, *et al.*,

     Defendants.

Case No. 2:18-cv-735
Judge Edmund A. Sargus, Jr.
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

This matter is before the Court on Plaintiff Premier Dealer Service, Inc.'s ("PDS") Motion for Summary Judgment (ECF No. 100), Defendants Allegiance Administrators, LLC's ("Allegiance") and Dimension Service Corporation's Motion for Summary Judgment (ECF No. 101), and Defendants' Motion to Strike Exhibits and Arguments in Plaintiff's Motion for Summary Judgment (ECF No. 114). The motions are fully briefed and ripe for adjudication. For the following reasons, PDS's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**; Allegiance's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**; and Allegiance's Motion to Strike is **DENIED AS MOOT**.

### I. Background and Undisputed Material Facts

### A.  The Parties and the Automobile Service Contract Business

The Court set out the facts giving rise to this dispute in its November 6, 2018 Opinion denying PDS's motion for a preliminary injunction. The parties rely on the foundational testimony from the preliminary injunction hearing in the instant motions for summary judgment. (Pl.'s Mot. Summ. J. at 1 ["Pl.'s Mot"], ECF No. 100; Defs.' Mot. Summ. J.  at 6 ["Defs.' Mot."], ECF No.

101.)  Thus, the Court will recount the undisputed facts established during the preliminary injunction hearing.  (Prelim. Inj. Hr'g Tr., ECF No. 29.)

PDS and Allegiance compete as administrators of automobile service contracts ("Service Contracts"). Service Contracts, commonly known as extended warranties, are agreements between an obligor and a customer purchasing a vehicle. With any Service Contract, the obligor agrees to repair or replace, for a specific coverage period, certain vehicle parts following a breakdown. The Service Contracts must be backed by an insurance company, which works with the obligor and an administrator to approve the terms and manage the risk. The total price of any Service Contract is known as the "Dealer Cost."

For the customers who enter a Service Contract, the lumpsum Dealer Cost is straightforward. For the four other parties involved in any Service Contract (the obligor, administrator, insurer, and dealer), however, Dealer Costs are comprised of several parts: first, there is the marketing fee, which is set by the obligor and paid to the dealership that sold the Service Contract; second, the administration fee, which is a flat fee negotiated between the obligor and the administrator; third, the insurance fee, which a pre-selected insurer determines and approves; fourth, the road assistance fee for which the obligor also negotiates; and fifth—and most importantly for purposes of this case—the "Reserve," which is the calculated amount that the obligor and the administrator determine and then set aside to pay future claims.

The Reserve amount is critical to an obligor's success because the obligor must market programs at competitive prices but must also allocate an appropriate amount for future claims. If the Reserve amount does not cover a claim, then the obligor and the insurer bear the loss. To protect each party involved, the Dealer Costs and its five components are generally considered confidential throughout the industry.

### B.  PDS Relationship With Tricor Automotive Group

Tricor Automotive Group ("Tricor"), which is not a party to this case, was the obligor in all Service Contracts relevant to this lawsuit. Tricor offers affiliated automobile dealerships throughout Canada various Service Contracts that those dealerships sell to customers buying new and used vehicles. From 2001 to May 29, 2018, PDS served as Tricor's administrator of Service Contracts. Within that role, PDS began using its proprietary "Rating Process" in 2008 to set Reserves for Service Contracts sold through Tricor-affiliated dealerships in Canada.  PDS also contracted with Tricor to permit Tricor to sell PDS's "Lifetime Powertrain Loyalty Program (LPLP) Certificate"—which are the subject of PDS's copyright infringement claim.

#### 1.  The 2011 Marketing Agreement and PDS's Lifetime Powertrain Loyalty Certificates

In 2011, Tricor and PDS entered into a Private Label Marketing Agreement.  ("Marketing Agreement," ECF No. 46-4.)  Pursuant to the Marketing Agreement, PDS authorized Tricor to market PDS's "aftermarket automobile products and programs for automobile dealers"; "vehicle service agreements"; "prepaid maintenance plans"; "lifetime loyalty programs"; and "limited warranty programs[.]"  (*Id.* at 1.)  In the Marketing Agreement, Tricor agreed not "make use of or disclose to any third parties, any Proprietary Information obtained as a result of or in connection with the relationship contemplated herein."  (*Id.* at 3.)  Additionally, the agreement specified that "[a]ll forms, records and supplies including, but not limited to insurance forms and rate charts, provided by [PDS], are and will remain the property of [PDS]."  (*Id.* at 5.)

As the Marketing Agreement mentions, PDS agreed to let Tricor sell Lifetime Powertrain Loyalty Program Certificates ("LPLP Certificates") created by PDS.  (*Id.* at 1.) PDS has two copyrights registered with the U.S. Copyrights Office for its LPLP Certificates.  The first copyrighted LPLP Certificate was first published on May 1, 2008 and registered on May 2, 2012.

(Copyright TX 7-673-553, ECF No. 100-1.) The second copyrighted LPLP Certificate, a derivative work of the first copyrighted LPLP Certificate, was first published on June 26, 2012 and registered on June 4, 2013. (Copyright TX 7-741-273, ECF No. 100-1.)

Importantly, an LPLP Certificate is not a warranty or a vehicle service contract. (*See id.*; Dep. of Lisle Greenweller 61:9–15.) Rather, lifetime powertrain products are "dealership giveaway products which promote customer retention and provide for mechanical coverage in the event of breakdown upon meeting various service requirements." (2014 Administration (Program) Agreement at 2, ECF No. 46-1.) The composition of the copyrighted LPLP Certificates are relevant here. Copyrighted LPLP Certificate TX 7-741-273 is a two-page form. (Copyright TX 7-741-273.) The first page contains three sections at the top—covering roughly 25% of the form— with blank boxes for the filling in of customer information, dealer information, and vehicle and certificate information. (*Id.*) The remainder of the first page and the second page contain six additional sections with detailed information about the loyalty program. (*Id.*) PDS's copyright extends to the "text" of the LPLP Certificates. (*Id.*)

PDS did not use the copyrighted LPLP Certificates in its relationship with Tricor because the copyrighted LPLP Certificates were not tailored for use in Canada. (Greenweller Dep. 61:16– 62:1.) PDS created a derivative LPLP Certificate for Tricor to market in Canada and modified only those things specific to Canada (the "Canadian LPLP Certificate"). (*Id.*; Canadian LPLP Certificate, ECF No. 100-2.) Aside from minor editing changes and Canadian-specific terms ("kilometres" instead of "miles"; "provinces" instead of "states"), the language in the Canadian LPLP Certificate is nearly identical to the copyrighted U.S. LPLP Certificate TX 7-741-273.

4

**2. The 2014 Administration Agreement, the Rating Process, and the Reserves**

In 2014, Tricor and PDS executed an Administration (Program) Agreement ("2014 Agreement") that set out the parties' obligations regarding the administration of Service Contracts. (2014 Agreement, ECF No. 46-1.)  The preamble of the 2014 Agreement states that "[Tricor] is the administrator of Program Contracts on behalf of [a marketing company] and/or [Tricor's insurer] and wishes to subcontract some of these duties including claims handling to PDS[.]"  (*Id.* at 1.)  Furthermore, the preamble specifies that "[Tricor] also desires PDS to provide analysis and support for pricing adjustments as well as aid in designing Program Contracts from time to time[.]" (*Id.*)

> In the agreement, the parties defined "Confidential Information" as:
>
> "this Agreement and all data, trade secrets, trademarks or marks, business information, Programs, Dealer Cost, and any other information of any kind whatsoever that a party herein discloses, either orally or in writing, to the other party. A writing shall include an electronic transfer of information by electronic mail, over the Internet or otherwise.

(*Id.* at 3–4.). But nothing in the contract explains what qualifies as either party's property. The 2014 Agreement defined the duties of Tricor and PDS related to development and maintenance of the Dealer Cost, stating:

> [Tricor] shall be assisted by PDS in co-ordinating Programs with [Tricor's insurer] and shall be responsible for development of all PROGRAMS including … Premium, Reserves, and third party fees and commissions. These amounts plus the Administration Fees set by PDS shall comprise the Dealer Cost.

*Id.* at 6.

According to the 2014 Agreement: "PDS shall manage its administrative rating systems in strict compliance with the set Dealer Cost Amounts." (2014 Agreement at 6.)  The Agreement also defines "Reserves" as:

> <u>"Reserves"</u> shall mean funds required for Claims. Reserves include:

(i)     "Base Reserves" which are the minimum amount of funds required
        for PROGRAM claims; and

(ii)    "Additional Reserves" which are reserves above the Base Reserves,
        are to be determined by [Tricor] and/or [Tricor's insurer] and may
        be included on a PROGRAM for an individual Dealer or agent.

Tricor has had control over the Reserves in its relationship with "various administrators" since 1987.  (Prelim. Inj. Hr'g Tr. 183:18–22.)  In its relationship with PDS, Tricor had the final say over the Reserve amount.  (*Id.* at 141:22–142:4.)  Tricor and its insurer bear the risks affiliated with the Reserve amount. (*Id.* at 79:6–12, 132:8–11, 183:18–184:1.)  Because the obligor in any Service Contract must support its Reserves, the obligor—in this case, Tricor—carries the risk. (*Id.*)  Tricor also listed the Reserves as equity in its accounting records. (*Id.* at 144:2–12.)  As of 2018, Tricor-owned companies had $160 million in shareholder equity standing behind its Reserves.  (*Id.*)

During the Tricor-PDS relationship, PDS used its proprietary Rating Process to develop Reserve amounts for Tricor.  (*Id.* at 79:24–84:6.)  PDS created its own process in 2006 for coming up with Reserve amounts based on vehicle class taking into account historical data for different makes and models of vehicles. (Id. 11:14–14:12.)  PDS's business model is to create a Reserve amount to help both PDS and its partner profit. (*Id.*)  Tricor never received PDS's proprietary Rating Process.  (*Id.* at 50:5–11.)

## C. End of Tricor-PDS Relationship and Beginning of Tricor-Allegiance Relationship

While still working with PDS under the 2014 Agreement, Tricor explored the prospect of investing in its own administrative platform.  (*Id.* at 153:4–5.)  In September 2017, Tricor approached PDS to discuss a potential deal.  After PDS presented its offer, Tricor's board of directors sought to "find out what the real value of our business might be to somebody." (*Id.* at

154:17–18.) To that end, Tricor considered Allegiance, which had been conducting business with Tricor-affiliated companies since 2006. (*Id*. at 154:19–21)

In November 2017, the President of Tricor, Joseph Campbell, contacted Allegiance's Director of Underwriting and Actuarial Services, Paul Miles. Campbell consulted Miles because he wanted "somebody who could assist [Tricor] in evaluating the rates" Tricor was charging. (*Id*. at 155:13–16.) By December 2017, Tricor and Allegiance had entered a "quasi-general agreement" about Tricor's value. (*Id*. at 155:2–8.) Around that time, Tricor and Allegiance also began discussing "whether [Allegiance] could admin [Tricor's Service Contracts] knowing it was going to disrupt [Tricor's] business no matter what." (*Id*. at 155:2–4.) Then, in January 2018, Tricor determined that Allegiance would be able to administer the Service Contracts because Allegiance had experience in the industry and actuarial support. (*Id*. at 155:9–16.)

On January 25, 2018, Campbell sent Miles Tricor's total Dealer Costs and flat fees that represented what the fees "would be on a go-forward business with Allegiance as administrator." (*Id*. at 195:18–20.) Miles testified, "[k]eep in mind, I don't know what the flat fees were on the previous arrangements, so I don't know that that's equal to the reserve that was currently in place, but that's what I'm referring to as a proposed reserve, in case those fees were different." (*Id*. at 195:11–15.) With the Dealer Costs and the Reserves that Tricor provided to Allegiance, Miles made slight changes to the Reserves for use in the Allegiance-Tricor relationship. (*Id*. at 198:2–17.)

On May 29, 2018, the relationship between PDS and Tricor ended. After PDS terminated the contract with Tricor, PDS allowed Tricor-affiliated dealers to access its database so that dealers could adjust or cancel Service Contracts entered into prior to the termination of the PDS-Tricor relationship. (*Id*. at 73:4–9.) In July 2018, PDS analyzed how Tricor dealerships were using its

portal. This analysis indicated that Tricor-affiliated dealers continued accessing PDS's portal to impermissibly backdate contracts, which allowed the dealers to potentially solicit PDS's rate information, only to then write Service Contracts on Allegiance paper. (*Id.* at 33:4–7.)

After the PDS and Tricor relationship ended, Tricor sent Allegiance the Canadian LPLP Certificates that PDS created for Tricor's use. (Dep. of Michelle DeFouw 10:6–11:17.) Tricor employee Michelle Fish emailed Allegiance employee Michelle DeFouw the PDF documents of the LPLP Certificates "currently in use" on April 10, 2018 and told DeFouw that the LPLP Certificates were Tricor's. (*Id.*, Ex. 37, ECF No. 98-9.) In emails and in a phone conversation, Fish requested that DeFouw make certain changes to the LPLP Certificates so that Tricor could continue using the Certificates with Allegiance. (*Id.* at 19:2–21.) DeFouw took the PDF documents, made the requested changes, and emailed the edited LPLP Certificates (the "new Tricor LPLP Certificates") back to Fish with outlines of the specific changes made. (*Id.*, Ex. 37.) For example, DeFouw made minor changes to the language in the Certificates, such as changing the website customers were required to use and substituting a different mailing address. (*Id.*) Outside of these small changes, the language and appearance of the documents remained nearly identical to the LPLP Certificates PDS created for Tricor. (*Id.*) DeFouw made the changes either from Allegiance's offices in Dublin, Ohio or from her home in Grove City, Ohio. (*Id.* at 11:25–12:8.)

In July 2018, PDS filed this lawsuit against Defendants Allegiance and Dimension (an Allegiance affiliate) in the Franklin County Court of Common Pleas, Allegiance removed to this Court. PDS then filed a motion for preliminary injunction to enjoin Allegiance from using its alleged trade secrets. (Mot. Prelim. Inj., ECF No. 4.) Following a hearing, this Court denied PDS's motion for a preliminary injunction on November 6, 2018. (ECF No. 40.) On January 25,

2019, PDS filed a Second Amended Complaint for misappropriation of trade secrets and copyright infringement.  (Second Am. Compl., ECF No. 46.)  Allegiance answered and also filed counterclaims for tortious interference with contract or business relationships, common law unfair competition, and a declaratory judgment that PDS does not have a protectable copyright interest against Allegiance regarding the LPLP Certificates.  (Answer and Counterclaim, ECF No. 50.) The parties have now filed cross motions for summary judgment, which are ripe for review.

## II. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323.  The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("The requirement that a dispute be 'genuine' means that there must be more than some metaphysical doubt as to the material facts.").  Consequently, the

central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

## III. Analysis

### A. Misappropriation of Trade Secrets

The parties have filed cross motions for summary judgment on PDS's claim for misappropriation of trade secrets. (Pl.'s Mot. at 9; Defs.' Mot. at 10.) In support of their motions, the parties rely on testimony from the preliminary injunction hearing and additional evidence obtained during discovery following the denial of PDS's motion for a preliminary injunction.[1]

PDS claims that Allegiance misappropriated the Reserves it received from Tricor. (Pl.'s Mot. at 10.) To prevail on a misappropriation of trade secrets claim, a plaintiff must show by a preponderance of the evidence that: (1) a trade secret exists; (2) the defendants acquired the trade secret because of a confidential relationship; and (3) the defendants used the trade secret without authorization. *Hoover Transp. Serv., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003); Ohio Rev. Code § 1333.61. "Proof by clear and convincing evidence is required to justify relief in trade secrets cases under O.R.C. § 1333.62." *Prosonic Corp. v. Stafford*, 539 F. Supp. 2d 999, 1005 (S.D. Ohio 2008). Ohio law defines a "trade secret" as information that:

> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use;

---

[1] Allegiance argues that the Court's factual findings in its preliminary injunction decision are now the law of the case. (Defs.' Mot. at 15.) However, as "a general rule, decisions on preliminary injunctions do not constitute law of the case and parties are free to litigate the merits." *William G. Wilcox, D.O., P.C. Employees' Defined Ben. Pension Tr. v. United States*, 888 F.2d 1111, 1114 (6th Cir. 1989) (quoting *Golden State Transit Corp. v. City of Los Angeles*, 754 F.2d 830, 832 n. 3 (9th Cir.1985)) (internal quotations omitted). The Court's preliminary findings are not law of the case. Following the preliminary injunction decision, PDS remained free to litigate the merits and present more evidence to the Court at the summary judgment stage.

> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D).

"The law in Ohio . . . is that to bring a claim for misappropriation of trade secrets, one must either own or have possession or a right to control the trade secrets and have taken active steps to maintain their secrecy." *RPM, Inc. v. Oatey Co.*, 2005-Ohio-1280, ¶ 15, 2005 WL 663057, at *3 (Ohio Ct. App. 2005) (citing *Fred Siegel Co., L.P.A. v. Arter & Hadden* (1999) 707 N.E.2d 853 (Ohio 1999)). Whether information qualifies as a trade secret is ordinarily a question of fact. *DeBoer Structures (U.S.A.) Inc. v. Shaffer Tent And Awning Co.*, 233 F. Supp. 2d 934, 948 (S.D. Ohio 2002)

Here, viewing the facts in the light most favorable to PDS, PDS's trade secret claim fails because the undisputed evidence establishes that Tricor owned the Reserves. Thus, PDS cannot assert trade secret protection over the Reserves prepared pursuant to the 2014 Agreement between PDS and Tricor. And even assuming PDS could assert a possessory interest in the Reserves developed using PDS's Rating Process, Tricor ultimately owned that information and therefore had a right to share that information with Allegiance. Allegiance thus could not have misappropriated the Reserves because Allegiance, as a matter of law, had consent to use the Reserve information from the owner of that information.

Start with the 2014 Agreement between PDS and Tricor. (2014 Agreement, ECF No. 46-1.)[2] The Agreement does not expressly state that Tricor owns the Reserves, but the Agreement expressly gives Tricor the ultimate responsibility for developing the most of the components

---

[2] Contract interpretation is a matter of law. *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 875 N.E.2d 561, 568 (Ohio 2007).

comprising the "Dealer Cost"—including the "Reserves"—while PDS is only responsible for setting "Administration Fees":

> "[Tricor] *shall be assisted by PDS* in co-ordinating Programs with [Tricor's Insurer] *and shall be responsible for* development of all PROGRAMS including Program Contracts, underwriting and eligibility guidelines, Premium, *Reserves*, any third party fees and commissions. These amounts plus the *Administration Fees set by PDS* shall comprise the Dealer Cost."

(*Id.* at 6 (emphasis added).)  That the parties agreed to make Tricor responsible for setting the Reserves while expressly making PDS responsible for setting a different component of the Dealer Cost undercuts any claim that Tricor does not have ownership of the Reserves.  Furthermore, "Additional Reserves"—which are "reserves above the Base Reserves"—are "*to be determined by [Tricor]* and/or [Tricor's Insurer] . . . ." (*Id.* at 4 (emphasis added).)  This definition expressly grants Tricor the responsibility for establishing "Additional Reserves"—consistent with the agreement that "[Tricor] . . . shall be responsible for development of all PROGRAMS including . . . Reserves[.]"  (*Id.* at 6.)

Other undisputed pieces of evidence confirm Tricor's ultimate ownership and control over the Reserves.  First, Tricor has had control over the Reserves in its relationship with "various administrators" since 1987. (Prelim. In. Hr'g Tr. 183:18–22.)  Second, Tricor—as the obligor—and its insurer bear the risks affiliated with the Reserves.  Because the obligor in any Service Contract must support its Reserves, the obligor carries the risk.  (*Id.* at 132:8–11, 183:18–184:1.)  On the other hand, while PDS's profits depend on aiding the obligor in optimizing its Reserves, PDS did not directly bear financial risk for the Reserves' accuracy as did Tricor. Third, Tricor listed the Reserves as equity in its accounting records. (*Id.* at 144:2–12.)  As the Court concluded in denying PDS's motion for a preliminary injunction: this one-sided comparison of undisputed

evidence illustrates that Tricor has ownership of the Reserves.  The Reserves are therefore not, as a matter of law, PDS's to protect.

Following discovery in this case, PDS's evidence is insufficient to demonstrate a genuine dispute of fact to survive Allegiance's motion for summary judgment on this claim.  PDS characterizes the Reserves as the "fruits" of its proprietary Rating Process, making the Reserves a protectable trade secret.  (Pl.'s Mot. at 10.)  However, even assuming that PDS has some possessory interest in the Reserves created using its proprietary Rating Process, there is no genuine dispute that Tricor had ultimate ownership of the Reserves.  The 2014 Agreement expressly states that "[Tricor] desires PDS to *provide analysis and support* for pricing adjustments as well as *aid in* designing Program Contracts from time to time[.]" (2014 Agreement at 2 (emphasis added).)  In other words, per the Agreement, the numbers PDS produced as a result of its Rating Process were ultimately for Tricor's use.  And Tricor never acquired—and thus did not provide to Allegiance—PDS's proprietary Rating Process.  Therefore, even if PDS could establish that it was entitled to assert some level of trade-secret protection over the Reserves outside of the Tricor-PDS relationship, Allegiance could not have used those Reserves "without authorization" because it is undisputed that Tricor authorized Allegiance to use that data. *Frye*, 77 F. App'x at 782.

PDS also cites to deposition testimony of Allegiance witnesses that it contends is inconsistent from the testimony of those witnesses during the preliminary injunction hearing. (Pl.'s Resp. in Opp'n at 10–14.)  This evidence, however, pertains to Allegiance's conduct in making slight changes to Reserves after it received that information from Tricor, which PDS contends illustrates Allegiance's "guilty conscience." (*See id.*)  This evidence does not create a genuine dispute as to the ownership of the Tricor-PDS Reserves or whether Allegiance was legally authorized to use those Reserves.

Lastly, PDS argues that the 2011 Marketing Agreement between Tricor and PDS establishes PDS's ownership over the information Tricor sent to Allegiance.  (Pl.'s Reply at 6–8, ECF No. 113.)  That Agreement specified that all "forms, records and supplies including, but not limited to insurance forms and rate charts, provided by [PDS], are and will remain the property of [PDS.]"  (Marketing Agreement at 5, ECF No. 46-4.)  PDS argues that "rate charts" (as used in the Marketing Agreement) were included in the "business information" that went from PDS to Tricor (under the 2014 Agreement) and that Allegiance therefore misappropriated PDS's proprietary information.  (Pl.'s Reply at 6–8.)  PDS's misappropriation claim, however, is about Allegiance's alleged misappropriation of the Reserves.  (Pl.'s Mot. at 10.) "Reserves"—a technical term in the industry and a defined term in the 2014 Agreement—is not mentioned at all in the Marketing Agreement. *See Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Authority*, 678 N.E.2d 519, 526 (Ohio 1997) (when interpreting a contract, "[t]echnical terms will be given their technical meaning, unless a different intention is clearly expressed.").  The Marketing Agreement has nothing to do with the parties' rights and obligations regarding the Reserves or the administration of Service Contracts.  (*Compare* 2014 Agreement, ECF No. 46-1 *with* Marketing Agreement, ECF No. 46-4.)  The plain meaning and context of the term "rate charts" in the Marketing Agreement do not show that the parties intended to give PDS a proprietary interest in Tricor's Reserves.

Accordingly, the undisputed evidence establishes that Tricor owned the Reserves developed in the Tricor-PDS relationship.  Thus, PDS's claim for misappropriation of trade secrets fails as a matter of law.  The Court therefore grants Allegiance's motion for summary judgment and denies PDS's motion for summary judgment as to PDS's misappropriation claim.

14

### B. Copyright Infringement

The parties next move for summary judgment on PDS's claim for copyright infringement. (Pl.'s Mot. at 14; Defs.' Mot. at 21.)  "The Copyright Act provides protection for original works of authorship expressed in various media." *Stromback v. New Line Cinema*, 384 F.3d 283, 293 (6th Cir. 2004) (citing 17 U.S.C. §§ 101–1332)).  Relevant here, the owner of a copyright has exclusive rights to "reproduce the copyrighted work" and to "prepare derivative works." *Id.* (citing 17 U.S.C. § 106)).  To succeed on a claim for copyright infringement, a plaintiff must prove: (1) ownership of a valid copyright; and (2) that the defendant copied it.  *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003).  PDS is entitled to summary judgment because PDS owned a valid copyright and it is undisputed that Allegiance copied it.

### 1. PDS owns a valid copyright.

The first prong—ownership of a valid copyright—"tests the originality and non-functionality of the work, both of which are presumptively established by the copyright registration." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 534 (6th Cir. 2004) (internal citation omitted).  The "threshold showing of originality is not a demanding one." *Id.* (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345, (1991) ("the requisite level of creativity is extremely low; even a slight amount will suffice.")). "Original . . . means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity . . . even if the work is not a 'novel' one." *Id.* (citing *Feist*, 499 U.S. at 345–46) (internal quotations omitted).  The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Feist*, 499 U.S. at 345 (internal quotations and citation omitted).

15

PDS has established the presumptive validity of its copyright by providing a certificate of registration made "within five years after the first publication" of its U.S. LPLP Certificate. (Copyright TX7-741-273.) Because PDS produced its copyright registration, the burden shifts to Allegiance to rebut the copyright's presumptive validity. *Hi-Tech Video Prods., Inc. v. Cap. Cities/ABC, Inc.*, 58 F.3d 1093, 1095 (6th Cir. 1995).

Allegiance challenges the originality of PDS's copyright. It argues that PDS's copyrighted U.S. LPLP Certificate is not sufficiently original to warrant copyright protection.[3] (Defs.' Mot. at 32.) Allegiance argues that (1) the "fill-in-the-blank portions of the forms at issue are not copyrightable because they are not original"; and (2) that the text of the LPLP Certificate was "dictated by third-parties, such as insurers, or were required by legal compliance measurers[,]" and are thus non-protectable under the "scenes à faire" doctrine. (Defs.' Mot. at 32–35.)

### a. The copyrighted LPLP Certificate is not a generic fill-in-the blank form.

Allegiance relies on *M. M. Bus. Forms Corp. v. Uarco, Inc.*, 472 F.2d 1137 (6th Cir. 1973), which held that "forms, including blank forms, which are intended to be used for recording facts are not the proper subjects of copyright." *Id.* at 1139. Allegiance also relies on *Tastefully Simple, Inc. v. Two Sisters Gourmet, L.L.C.*, 134 F. App'x 1, 4 (6th Cir. 2005), which held that a food company's "100% Satisfaction, Customer Order, and Product Return/Claim forms" were not copyrightable because they were nothing more than a "convenient matrix to record information" that the company required "when a consultant returns a product." *Id.* Indeed, "[b]lank forms, such as time cards, graph paper, account books, diaries, bank checks, scorecards, address books, report

---

[3] Allegiance argues both that PDS's LPLP Certificate is not a "protectable work" under copyright law but also cites to caselaw concerning the second prong—whether Allegiance copied "constituent elements of the work that are original." (Defs.' Mot. at 32.) Ultimately, Allegiance argues that no portion of the LPLP Certificate is copyrightable; thus, the Court will analyze Allegiance's arguments under the first element of the two copyright infringement elements.

16

forms, order forms and the like, which are designed for recording information and do not in themselves convey information" are not subject to copyright protection. 37 C.F.R. § 202.1. "[W]hether a form is a 'blank form,' and therefore not entitled to copyright protection, is a question of law for the court to decide." *Tastefully Simple*, 134 F. App'x at 4.

Here, the copyrighted LPLP Form is not simply a "blank form" designed for recording information" that does not in itself "convey information[.]" *Id.* The form contains nine different sections. (Copyright TX7-741-273.) The first three sections—which cover roughly 25% of the first page of the two-page form—are blank boxes designed for the collecting of customer information, dealer information, and vehicle and certification information. (*Id.*) But the remaining six sections convey an abundance of information about the Lifetime Powertrain Program. (*Id.*) Thus, the copyrighted LPLP Certificate is not like the form at issue *Tastefully Simple*—it is much more than a "convenient matrix to record information[.]" *Tastefully Simple*, 134 F. App'x at 4.

The fact that a portion of the LPLP Certificate is designed for collecting information does not render the entire document not subject to copyright protection. Indeed, the copyright registration extends only to the author-created "text." (Copyright TX7-741-273.) PDS acknowledges that its "copyright claims are directed solely to the information conveying text found in the LPLP Certificate and do not extend to un-protectable elements such as the blank areas seeking information, the general layout, or the general idea of providing repair coverage as a customer incentive." (Pl.'s Resp. in Opp'n at 23, ECF No. 108.)

### b. The information in the LPLP Certificate does not fall under the scenes à faire doctrine.

Allegiance next argues that language in the LPLP Certificate is not protectable under the "scenes à faire" doctrine. (Defs.' Mot. at 34.) In the context of literature, this doctrine "excludes copyright protection for 'incidents, characters or settings which are as a practical matter

indispensable, or at least standard, in the treatment of a given topic.'" *Stromback*, 384 F.3d at 296 (citation omitted).  For example, as the court in *Stromback* explained, "parties, alcohol," and "wild behavior" are "natural elements in a story about a college fraternity." *Id.* Such "common themes and ideas throughout literature and are beyond any level of abstraction at which copyright protection might begin to attach." *Id.* The "scenes à faire" doctrine has also been applied in the computer software context. *Lexmark Int'l*, 387 F.3d at 535.  In that industry, "elements of a program dictated by practical realities—e.g., by hardware standards and mechanical specifications, software standards and compatibility requirements, computer manufacturer design standards, target industry practices, and standard computer programming practices—may not obtain protection." *Id.*

Allegiance, analogizing the insurance industry to the literature and software contexts, argues that the doctrine of "scenes à faire" applies here because the details in the copyrighted LPLP Certificate "necessarily follow from the common requirements of insurance companies throughout the extended warranty industry."  (Defs.' Mot.)  In support of this argument, Allegiance cites PDS's president's testimony that "an insurer would always review and modify the textual terms and conditions, and have final approval of the language."  (*Id.* (citing Greenweller Dep. 24:21–25:22).)  But this statement was in response to a question about the general requirements for "vehicle service contracts" at Great American Insurance (the owner of PDS) in the early 2000s. (*See* Greenweller Dep. 22:23–25:22.)  Greenweller's testimony did not pertain to the copyrighted LPLP Certificate, which is different than a vehicle service contract.  (*Id.* at 61:9–15; Copyright TX7-741-273 ("This Loyalty Certificate is not a product warranty nor is it a service contract.").)

Allegiance has not pointed to evidence that the copyrighted language in PDS's LPLP Certificate follow from the "requirements of insurance companies" that are so commonplace that

the certificate is not copyrightable as an original work. The language in the LPLP Certificate might seem dull or boilerplate, but all that's necessary for copyright protection is some "minimal degree of creativity"—and the language need not be "novel." *Feist*, 499 U.S. at 345–46. PDS is also not asserting copyright protection over the general idea of providing repair coverage as a customer incentive"—but is instead asserting protection over the specific construction of language in its LPLP Certificate. (Pl.'s Resp. at 23.) The "scenes a faire" doctrine therefore does not invalidate PDS's copyright.

In sum, Allegiance fails to rebut PDS's presumptively valid copyright. The analysis of PDS's infringement claim therefore proceeds to the second element.

### 2. Allegiance copied original portions of PDS's copyrighted LPLP Certificate

The second prong—copying by the defendant—"tests whether any copying occurred (a factual matter) and whether the portions of the work copied were entitled to copyright protection (a legal matter)." *Lexmark Int'l*, 387 F.3d at 534.

### a. Whether copying occurred

"A plaintiff may demonstrate that original elements of its work were copied through direct or indirect evidence." *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 536 (6th Cir. 2020). This case is one of the "rare" cases with direct evidence of copying. *See id.* It is undisputed that Ms. DeFouw, an Allegiance employee, copied the new Tricor LPLP Certificates directly from the Canadian LPLP Certificates that PDS made for Tricor. (DeFouw Dep. 19:11–22:12.) Tricor provided Allegiance with a PDF of the Canadian LPLP Certificate it received from PDS; DeFouw then used those PDFs to make changes requested by Tricor and sent the new Tricor LPLP Certificates back to Tricor. (*Id.*, Ex. 37.) Thus, this claim turns on the legal

question of "whether the portions of the work copied were entitled to copyright protection[.]" *Lexmark Int'l*, 387 F.3d at 534.

### b.  Whether the copied portions are entitled to copyright protection

Allegiance argues that the Canadian LPLP Certificate (from which it created the new Tricor LPLP Certificate) is not entitled to copyright protection for several reasons.  Specifically, it first argues that the Canadian LPLP Certificate is not copyrighted in the U.S. or Canada and thus copying from the Canadian LPLP Certificate is not an infringement.  (Defs.' Mot. at 27.)  Second, it argues PDS has no exclusive ownership in the Canadian LPLP Certificate that it provided to Tricor and that it therefore cannot base its infringement claim on Allegiance's copying of the Canadian LPLP Certificate.  (*Id.* at 30.)  Third, it argues that the new Tricor LPLP Certificates copied from the Tricor-PDS's Canadian LPLP Certificate is not a derivative of PDS's copyrighted U.S. LPLP Certificate. (*Id.* at 31.)

None of Allegiance's arguments is persuasive.  It is undisputed that PDS owned a valid copyright, that its Canadian LPLP Certificate was a derivative of the copyrighted U.S. LPLP Certificate, and that Allegiance copied the "new" Tricor LPLP Certificates in the United States directly from the derivative Canadian LPLP certificate.  And, as discussed above when analyzing the validity of PDS's copyright, the copied language meets the low threshold for originality required for copyright protection.

The owner of a copyright has exclusive rights to "reproduce the copyrighted work in copies" and to "prepare derivative works based upon the copyrighted work.  17 U.S.C. § 106(1)–(2).  A "derivative work" is "a work based upon one or more preexisting works" that is "recast, transformed, or adapted" from the preexisting work.  *Id.* § 101.  The right to prepare derivative works includes to right to authorize others to produce a derivative work.  *See Stewart v. Abend*,

495 U.S. 207, 221 (1990).  And when an authorized author creates a derivative work, the pre-existing elements of the derivative work remain subject to the original copyright.  *See id.* at 223; 17 U.S.C. § 103(b) ("The copyright in a . . . derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material.")

Courts to consider the issue have uniformly recognized that "if a third party copies a derivative work without authorization, it infringes the original copyright owner's copyright in the underlying work to the extent the unauthorized copy of the derivative work also copies the underlying work." *DC Comics v. Towle*, 802 F.3d 1012, 1023 (9th Cir. 2015); *see also Montgomery v. Noga*, 168 F.3d 1282, 1293 (11th Cir. 1999) (quoting 1 Nimmer § 3.05, at 3–34.20) ("the better view is that if the material copied was derived from a copyrighted underlying work, this will constitute an infringement of such work regardless of whether the defendant copied directly from the underlying work, or indirectly via the derivative work"); *Lennar Homes of Texas Sales & Mktg., Ltd. v. Perry Homes*, LLC, 117 F. Supp. 3d 913, 929 (S.D. Tex. 2015) ("even if the infringer copies underlying material only from the derivative work, the copyright owner of the underlying material has a cause of action against the infringer.").

Here, it is undisputed that the Canadian LPLP Certificate is a derivative work of PDS's copyrighted U.S. LPLP Certificate.  (Greenweller Dep. 61:16–62:1.)  And it undisputed that Allegiance created the new Tricor LPLP Certificate nearly verbatim from the derivative Canadian LPLP Certificate (which was itself taken verbatim from the copyrighted U.S. LPLP Certificate). (DeFouw Dep., Ex. 37; Greenweller Dep. 61:16–62:1.)  Even drawing the inference in Allegiance's favor that Tricor shared ownership in the derivative Canadian LPLP Certificate through its 2011 or 2014 contracts with PDS, the elements of the Canadian LPLP Certificate

derived from the copyrighted U.S. LPLP Certificate remain protected under PDS's valid copyright. *See Stewart*, 495 U.S. at 221–23. And it is immaterial that the Canadian LPLP Certificate was not itself copyrighted because it is undisputed that it was a derivative work of a work subject to copyright protection. *See Towle*, 802 F.3d at 1023; *Lennar Homes*, 117 F. Supp. 3d at 929. To be sure, as discussed above, PDS's copyright does not extend to the blank, information-collecting boxes on the LPLP Certificate; it does extend to the text of the new Tricor LPLP Certificates copied from the derivative Canadian LPLP Certificate.

Furthermore, the fact that Allegiance copied the Canadian LPLP Certificate for use in Canada does not render its acts outside the reach of the Copyright Act. While it is true that "United States copyright laws do not have extraterritorial effect," *Subafilms, Ltd. v. MGM-Pathe Commcationns Co.*, 24 F.3d 1088, 1091 (9th Cir. 1994), it is undisputed that Allegiance, without authorization from PDS, reproduced and copied the derivative Canadian LPLP Certificate in Ohio. (DeFouw Dep. 11:25–22:12.) These acts infringed on PDS's exclusive rights to "reproduce the copyrighted wok" and to "prepare derivative works based upon the copyrighted work[.]" 17 U.S.C. § 106(1)–(2). Allegiance also committed an act of infringement by exporting infringing copies of the new Tricor LPLP Certificates for use in Canada. 17 U.S.C. § 602(a)(2).[4]

Accordingly, PDS is entitled to summary judgment on its copyright infringement claim against Allegiance as to Allegiance's liability. PDS has not moved for summary judgment on the issue of damages. Thus, damages on PDS's infringement claim will be left for trial.

---

[4] ". . . exportation from the United States, without the authority of the owner of copyright under this title, of copies or phonorecords, the making of which either constituted an infringement of copyright, or which would have constituted an infringement of copyright if this title had been applicable, is an infringement of the exclusive right to distribute copies or phonorecords under section 106, actionable under sections 501 and 506." 17 U.S.C. § 602(a)(2).

### C. Allegiance's Counterclaims for Tortious Interference and Unfair Competition

Next, PDS moves for summary judgment on Allegiance's counterclaims for tortious interference with contract and business relationships, common law unfair competition, and declaratory judgment that PDS does not have a protectable copyright interest regarding the new Tricor LPLP Certificates. (Pl.'s Mot. at 18; Counterclaim ¶¶ 2–48.) PDS is entitled to summary judgment on each of Allegiance's counterclaims.

#### 1. Tortious Interference

In Ohio, the elements of "elements of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Fred Siegel Co*, 707 N.E.2d at 858. Similarly, the elements of tortious interference with a business relationship are "(1) a business relationship, (2) the wrongdoer's knowledge thereof, (3) an intentional interference causing a breach or termination of the relationship, and (4) damages resulting therefrom." *Geo-Pro Serv., Inc. v. Solar Testing Lab'ys, Inc.*, 763 N.E.2d 664, 672 (Ohio Ct. App. 2001) (citation omitted).

PDS argues that it is entitled to summary judgment because "[n]o court in Ohio has held that a lawsuit constituted a basis for a tortious business interference claim by the defendant in the action." (Pl.'s Mot. at 19.) Allegiance responds that its claim for tortious interference does not relate solely to the lawsuit, but also its allegation that PDS "rapidly cut off Tricor dealers from accessing Premier's system after Tricor went into business with Allegiance—even though system access was a necessity for Tricor dealers to handle their legal obligations to consumers." (Def.'s Resp. in Opp'n, at 18, ECF No. 109 (citing Counterclaim ¶ 22).)

PDS is entitled to summary judgment because Allegiance's evidence, taken as true, cannot satisfy the elements of either tortious interference with contract or tortious interference with business relationships.  Allegiance points to no evidence in the record that PDS procured a breach of contract by Tricor, *Fred Siegel Co.*, 707 N.E.2d at 858, or that PDS's actions caused a breach or termination of Tricor's relationship with Allegiance, *Geo-Pro Serv.*, 763 N.E.2d at 672.  Thus, there is no genuine dispute on whether PDS's acts tortiously interfered with the contract or business relationship between Allegiance and Tricor.

## 2.  Unfair Competition

PDS argues that it is entitled to summary judgment on Allegiance's unfair competition claim because this Court has held that Federal Rule of Civil Procedure 11 preempts Ohio common law tort claims for unfair competition.  (Pl.'s Mot. at 19.)  Allegiance alleges in its counterclaim that:

- "Premier filed the present litigation for purposes of retaliating against Allegiance and Tricor for entering into the Servicing Agreement."

- "This litigation is not founded in good faith, and was instituted with the intent and purpose of harassing and injuring Allegiance."

- "Premier commenced this litigation with a malicious purpose—to injure Allegiance and Tricor."

- "Premier did not bring this litigation honestly and in good faith."

- Premier "commenced and prosecuted this litigation to harass, annoy, intimidate, financially harm, or gain an unfair advantage over Allegiance. Such conduct constitutes unfair competition under the common law of the State of Ohio."

- "Premier's lawsuit against Allegiance is objectively baseless."

24

(Counterclaim ¶¶ 29–32.)  PDS is correct—Allegiance's counterclaim is the exact type of Ohio common law unfair competition claim that this Court has held is preempted by Rule 11.  *See, e.g.*, *Cheryl & Co. v. Krueger*, No. 2:18-CV-01485, 2020 WL 5423885, at *6 (S.D. Ohio Sept. 10, 2020).

A federal law may preempt a state law when "there is an actual conflict between a federal and a state law."  *Garcia v. Wyeth-Ayerst Lab'ys*, 385 F.3d 961, 965 (6th Cir. 2004).  When a party in federal court asserts a counterclaim for Ohio common law unfair competition based on allegations that a lawsuit against it was brought in bad faith or that the other party has made misrepresentations to the court, this Court has held that the unfair competition claim is preempted by Rule 11.  *Ashley Furniture Indus., Inc. v. Am. Signature, Inc.*, No. 2:11-CV-427, 2015 WL 12999664, at *5 (S.D. Ohio Mar. 12, 2015). As the Court explained in *Ashley Furniture*:

> "Value City's unfair competition counterclaim consists largely of Ashley's alleged misrepresentations to this Court. Federal Rule of Civil Procedure 11 expressly governs the kind of representations Ashley made to the Court and provides for sanctions in the case of misrepresentations concerning claims or defenses. Fed. R. Civ. P. 11(b)(2). Rule 11 also contains a safe harbor provision that allows a litigant to withdraw a representation within twenty-one days. Fed. R. Civ. P. 11(c)(1)(A). Ohio common law unfair competition does not contain such a safe harbor provision. It therefore directly conflicts with federal law and is preempted.

*Ashley Furniture*, 2015 WL 12999664, at *5 (*First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 529–30 (6th Cir. 2002)).

The *Ashley Furniture* analysis is directly on point here.  Allegiance's unfair competition claim is premised on allegations that PDS did not bring this lawsuit in good faith and that the suit is objectively baseless.  (Counterclaim ¶¶ 28–32.)  Thus, for the same reasons as the Court described in *Ashley Furniture*, Allegiance's counterclaim for Ohio common law unfair competition is preempted by Rule 11.  PDS is therefore entitled to summary judgment

### 3. Declaratory Judgment

Because the Court granted summary judgment in favor of PDS on its copyright infringement claim, PDS is also entitled to summary judgment on Allegiance's counterclaim for declaratory judgment whether PDS has a protectable copyright interest. Accordingly, PDS is entitled to summary judgment on each of Allegiance's counterclaims.

## IV. Motion to Strike

Allegiance filed a motion to strike several exhibits submitted by PDS in its summary judgment briefing. (Mot. to Strike, ECF No. 114.) Allegiance also moved to strike argument related to PDS's copyright infringement claim that PDS raised in its reply brief, but Allegiance's argument appears to be nothing more than a disguised surreply to PDS's reply brief. (*Id.*) Because these exhibits and Allegiance's improper surreply argument did not determine the outcome of the Court's ruling on this matter, Allegiance's Motion to Strike (ECF No. 34) will be denied as moot. *See Hughes v. Lavender*, No. 2:10-cv-674, 2011 WL 2945843, at *5 (S.D. Ohio July 20, 2011) (citing *Pullom v. U.S. Bakery*, 477 F. Supp. 2d 1093, 1109 (D. Or. 2007)).

## V. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion for Summary Judgment. (ECF No. 100.) Specifically, the Court denies Plaintiff's Motion for Summary Judgment as to its claim for misappropriation of trade secrets and grants Plaintiff's Motion for Summary Judgment as to Plaintiff's copyright infringement claim and as to Defendants' counterclaims.

The Court also **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment. (ECF No. 101.) Specifically, the Court grants Defendants' Motion for

Summary Judgment as to Plaintiff's claim for misappropriation of trade secrets and denies Defendants' Motion for Summary Judgment as to Plaintiff's copyright infringement claim.

Defendants' Motion to Strike is **DENIED AS MOOT**. (ECF No. 114.)

Finally, the Court also **GRANTS** Plaintiff's Motion to Continue. (ECF No. 126.) This case will proceed to trial on the issue of damages on Plaintiff's copyright infringement claim. The parties shall comply with the Magistrate Judge's order bifurcating damages discovery. (ECF No. 83.) Trial is **RESET** for Monday, November 15, 2021 and a new trial schedule will issue forthwith. The Court will administratively stay this case during damages discovery.

**IT IS SO ORDERED.**

**7/29/2021**                                    **s/Edmund A. Sargus, Jr.**
**DATE**                                         **EDMUND A. SARGUS, JR.**
                                                 **UNITED STATES DISTRICT JUDGE**