IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**PREMIER DEALER SERVICES, INC.,**

      **Plaintiff,**                 Case No. 2:18-cv-735
                                         Judge Edmund A. Sargus, Jr.
      v.                              Magistrate Judge Chelsey M. Vascura

**ALLEGIANCE ADMINISTRATORS,**
**LLC** *et al.***,**

      **Defendants.**

## OPINION AND ORDER

This copyright action came before the Court for a bench trial to determine copyright infringement damages on May 31, 2022, and June 1, 2022. The Court now sets forth its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

### I. BACKGROUND

Plaintiff Premier Dealer Services, Inc. ("Premier") and Defendant Allegiance Administrators, LLC ("Allegiance") compete as administrators of automobile service contracts and loyalty programs. Automobile dealerships offer loyalty programs to encourage customers to return to that dealership for maintenance in exchange for a discounted rate. Allegiance and Premier administer loyalty programs by enrolling customers and handling customer claims in the programs.

Tricor Automotive Group ("Tricor"), which is not a party to this case, was the obligor in all service contracts and loyalty programs relevant to this lawsuit. Tricor offers Canadian automobile dealerships various service contracts and loyalty programs that those dealerships sell to customers buying new and used vehicles. From 2001 to May 29, 2018, Premier served as Tricor's administrator of service contracts and loyalty programs. One program is called the "Lifetime Powertrain Loyalty Program (LPLP)." To sign up for the LPLP, customers or Premier

1

representatives completed an administrative form called the LPLP Certificate—which is the subject of Premier's copyright infringement claim. Premier has two copyrights registered with the U.S. Copyrights Office for its LPLP Certificates.

After Premier stopped working with Tricor in 2018, Allegiance began administering service contracts and loyalty programs for Tricor. Tricor sent Allegiance the Canadian LPLP Certificates that Premier created for Tricor's use and represented that the LPLP Certificates were Tricor's. Allegiance made minor changes to the LPLP Certificates. The language and appearance of the documents, however, remained nearly identical to the LPLP Certificates Premier created.

Premier filed suit against Allegiance in the Franklin County Court of Common Pleas on June 4, 2018, alleging copyright infringement of its LPLP Certificates, misappropriation of trade secrets, and violations of Ohio tort law. Allegiance removed the case to federal court. On summary judgment, this Court held Allegiance liable for copyright infringement of Premier's LPLP Certificates. (Op. & Order, ECF No. 128.) The Court held a bench trial to determine Premier's copyright infringement damages. (Minute Entries, ECF Nos. 227, 228.)

## II. LAW

The purpose of copyright infringement damages is "to compensate the copyright owner for losses from the infringement, and…prevent the infringer from unfairly benefitting from a wrongful act." *Cotter v. Christus Gardens, Inc.*, 238 F.3d 420 (6th Cir. 2000) (quoting H.R.Rep. No. 94-1476, at 161 (1976), *reprinted in* 17 U.S.C.A. § 504, at 146 (West 1996)). In general, copyright infringers are liable "for either ... (1) the copyright owner's actual damages and any additional profits of the infringer ... or (2) statutory damages." 17 U.S.C. § 504(a). The pertinent statute on proving actual damages and profits for a direct copyright infringement is 17 U.S.C. § 504(b), which provides:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b). In the alternative, "the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action." 17 U.S.C. § 504(c)(1).

In this case, Plaintiff Premier seeks only its lost profits, also called disgorgement profits. This is the amount of profit Allegiance earned from using the LPLP Certificate. Premier must show its lost profits by a preponderance of the evidence. *Smith v. Thomas*, 911 F.3d 378, 381 (6th Cir. 2018).

Section 504(b) of the Copyright Act provides a two-step calculation for lost profits. First, the copyright owner must present proof of "the infringer's gross revenue" that is "reasonably related" to the infringement. *ECIMOS*, 971 F.3d at 635; *Navarro*, 515 F. Supp. 3d 718, 764–65 (S.D. Ohio 2021) (describing the Sixth Circuit's reasonable relationship standard as "something less than causation," "generous," and "relatively lax"). The burden then shifts to the infringer to show (1) deductible expenses, and (2) the elements of revenue attributable to factors other than the copyrighted work. *Balsley v. LFP, Inc.*, 691 F.3d 747, 768–69 (6th Cir. 2012). Copyright infringers must "prove their deductible expenses with specificity." *Singletary Constr., LLC v. Reda Home Builders, Inc.*, 815 F. App'x 892, 899–900 (6th Cir. 2020). If the infringer does not meet its burden, the gross revenue figure is left to stand as the complete measure of lost profit damages. *Balsley*, 691, F.3d at 769.

3

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

At trial, the Court heard testimony from the following Premier witnesses: Lisle Greenweller, President of Premier Dealer Services; Nicholas Biagoli, expert witness; Christopher Bokhart, rebuttal expert witness. The Court heard testimony from the following Allegiance witnesses: Michelle DeFouw, CEO and Executive Vice President for Dimension Services and former Chief of Staff for Allegiance; Nicole Blackburn Tiell, Vice President of Administration at Allegiance; Douglas Terry, expert witness; Lyle King, expert witness; Dawn Murphy, Chief Operating Officer at Allegiance. The parties stipulated to the admission of the expert reports of Nicholas Biagoli, Christopher Bokhart, Douglas Terry, and Lyle King. The parties further stipulated to admitting the deposition transcript of Dawn Murphy, Allegiance's Federal Civil Rule of Procedure 30(b)(6) witness. The following exhibits were admitted into evidence at trial: Joint Exhibits 106, 122, 134, 138, 139, 140, 148, 150; Plaintiff's Exhibits 143, 214–218; Defendants' Exhibits 141, 146, 153, 155, 159, 164.

The evidence in this case consists of the sworn testimony of the witnesses who testified at trial, the sworn deposition testimony of Dawn Murphy, the expert reports, stipulated facts in the Final Pretrial Order, and the exhibits admitted into evidence. The Court will make inferences and deductions from the evidence based on reason and common sense. As the finder of fact in this case, the Court is the sole judge of the credibility of the witnesses and the weight their testimony deserves. The Court may be guided by the appearance and conduct of a witness, or by the way a witness testifies, or by the character of testimony given, or by evidence to the contrary of testimony given.

**A. Premier Presented Proof of Allegiance's Gross Revenue Attributable to Infringement**

The copyright owner must first present proof of "the infringer's gross revenue" that is "reasonably related" to the infringement. *ECIMOS*, 971 F.3d at 635; *Navarro*, 515 F. Supp. 3d 718, 764–65 (S.D. Ohio 2021). Premier meets its burden by proving Allegiance's gross revenue from the LPLP was $1,169,851 US dollars[1] between April 1, 2018, and October 31, 2021, and $1,279,280 US dollars between April 1, 2018, and April 30, 2022.[2]

In pretrial briefing and at trial, Allegiance contested whether the LPLP gross revenue is "reasonably related" to the Allegiance's infringement of the LPLP Certificate. Allegiance's witnesses testified that there is no evidence that the gross revenue was earned because of the LPLP Certificates. Allegiance contends the revenue stems from administering the LPLP itself, not the form used to enroll customers. This position is inconsistent with Sixth Circuit law.

The Sixth Circuit has explained that while the gross revenue must be reasonably related to the copyrighted material, there need not be a direct causal connection. In *Balsley v. LFP, Inc.*, the plaintiff sued a magazine for publishing a photograph of her without her permission. 691 F.3d 747, 769 (6th Cir. 2012). The magazine earned $1,148,000 in gross revenue for that issue of the magazine. *Id.* at 770. The *Balsley* Court held that "the relationship of the infringement to that gross revenue number was demonstrated by the parties' stipulation that photograph was published in" the issue. *Id.* at 770. The Court rejected the argument that the plaintiff had to prove the magazine profited *because of* the photograph or prove which portions of the revenue were attributable to the photograph. *Id.* at 769. As stated explicitly in the statute, "[p]laintiffs have only one requirement: to prove Defendant's gross revenue." *Id.* at 769.

---

[1] All values in this opinion are in U.S. Dollars (as opposed to Canadian Dollars) unless otherwise indicated.
[2] Premier and Allegiance used the time period April 1, 2018 to October 31, 2021 to calculate damages but Premier is entitled to damages from April 1, 2018 to April 30, 2022. The Parties used the first time period because they needed time to calculate damages and dispute the calculations before trial.

Just as the gross revenue from the magazine issue in *Balsley* had a reasonable relationship to the photograph in the magazine issue, the gross revenue from the LPLP has a reasonable relationship to the LPLP Certificate used to administer the program. In both cases, the copyrighted material was one small part of the final product. As in *Balsley*, Premier does not have to prove that Allegiance received revenue from the LPLP *because of* the LPLP Certificate. Premier also does not have to prove which portions of Allegiance's revenue, if any, are attributable to the LPLP Certificate. Premier merely has to show that the revenue is reasonably related to or stems from the LPLP. The reasonable relationship test "ensures only that a plaintiff is not placing before the jury revenue figures bearing absolutely no relationship to the infringing activity." *Navarro v. Procter & Gamble Co.*, 515 F. Supp. 3d 718, 765 (S.D. Ohio 2021).

Furthermore, the gross revenue is reasonably related even though the LPLP Certificate was not part of the final product sold—the LPLP. *See ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 635 (6th Cir. 2020) (finding a reasonable relationship between the revenue from a final product and infringing computer code in a quality control machine used to make the final product); *Navarro v. Procter & Gamble Co.*, 515 F. Supp. 3d 718, 765 (S.D. Ohio 2021) (finding the same where the infringing photograph was on the product's external packaging rather than on the product itself).

Premier meets its burden. It proved that Allegiance's gross revenue reasonably related to the infringement is the revenue from the LPLP—$1,169,851 dollars between April 1, 2018, and October 31, 2021, and $1,279,280 dollars between April 1, 2018, and April 30, 2022. Allegiance does not dispute these values, only their relationship to the infringement. The burden now shifts to Allegiance.

### B. Allegiance Proved Some Gross Revenue is Not Attributable to Infringement

In the second step of the lost-profit calculation, Allegiance has the opportunity to show deductible expenses or elements of revenue attributable to factors other than the copyrighted work. 17 U.S.C. § 504(b); *Balsley v. LFP, Inc.*, 691 F.3d 747, 768–69 (6th Cir. 2012). Allegiance must prove deductible expenses by a preponderance of the evidence. *Id.* If Allegiance does not meet its burden, Premier is entitled to recover the entire gross revenue amount.

Allegiance contends that it has $788,206 in expenses between April 1, 2018, and October 31, 2021, that should be deducted from the gross revenue amount, $1,169,851. Allegiance does not track expenses separately for each program it administers and consequently was unable to present an exact figure of LPLP expenses. Instead, Allegiance's expert, Douglas Terry, estimated the LPLP expenses for the purpose this lawsuit.

To calculate LPLP expenses, Terry first determined the amount of Allegiance's total expenses between April 1, 2018, and October 31, 2021. He confirmed the expense amounts Allegiance provided against the auditor's report and found the figures matched. Then, Terry worked with Allegiance Chief Financial Officer Brian Leslie to identify expense categories that were related to LPLP. Although Allegiance does not track expenses separately for each program, it tracks categories of expenses (*e.g.* salaries and benefits, professional services, rent expense, etc.) across all programs and operations. Allegiance represented that the following categories of expenses supported the LPLP: Salaries and Benefits, Tricor Automotive Group Management Expenses ("TAG"), Facility, Communications, General and Administrative, Insurance, and Audit and Tax Fees. (*See* Trial Ex. 138.) The sum of these categories of expenses is $24,150,842.

Next, Terry determined that LPLP revenue constitutes 3.3% of Allegiance's total revenue. He divided the LPLP revenue, $1,169,851, from the total revenue, $35,365,743, to reach 3.3%.

Terry applied the 3.3% to Allegiance's expenses potentially attributable to the LPLP, $24,150,842, which yields $798,877.

Terry then considered that Allegiance received a foreign-currency-exchange gain of $51,854 from Allegiance's Canadian Tricor business during the applicable time period. He calculated that the LPLP is 20.6% of the Tricor business. Therefore, 20.6% of the exchange gain, $10,671, is attributable to LPLP revenue. Subtracting $10,671 from $798,877 equals $788,206 in LPLP expenses.

To summarize, Terry submits that, of the $1,169,851 in LPLP gross revenue between April 1, 2018, and October 31, 2021, $788,206 is deductible expenses and the remaining $381,645 is profit. Based on Terry's calculations, Allegiance contends Premier is entitled to a lost profit damages amount of $381,645. (*See* Trial Ex. 146.)

Premier challenges Terry's method of calculation and input variables, arguing: (1) using the absorption approach is an improper method of calculating expenses; and (2) the LPLP expenses amount, $788,206, is artificially high because Terry included expense categories that do not support the LPLP.

**1. Method of Calculation**

Allegiance and Premier disagree whether to include Allegiance's general overhead costs in its deductible expenses. Allegiance's expert, Douglas Terry, used the absorption approach, which includes general overhead costs. Premier's expert, Christopher Bokhart, advocates for the incremental approach, which does not include all general overhead costs. Both are recognized methods of estimating overhead expense deductions. *See* Practical Law Intellectual Prop. & Technology, Copyright Litigation: Monetary Relief, (Reuters), p. 11.

8

a. *Absorption Approach*

Allegiance's proposed method, the full absorption approach, "allows deduction of a portion of any overhead expense related to the infringement, even if the expense did not vary as a result of the infringing good or service, if the infringer both: (1) demonstrates that the expense contributed to production of the infringing product, and (2) provides the court with fair and reasonable method for calculating the amount of the expense category that should be deducted." *Id.* The Second and Ninth Circuits adopted this approach in copyright cases. *See Hamil America Inc. v. GFI*, 193 F.3d 92 (2d Cir. 1999); *Frank Music Corp. v. Metro-Goldwyn-Mayer Corp.*, 772 F.2d 505, 516 (9th Cir. 1985).

Applying the absorption approach to this case, the percentage of LPLP expenses out of Allegiance's total expenses is the percentage of LPLP revenue out of Allegiance's total revenue. In other words, because 3.3% of Allegiance's revenue comes from the LPLP, it is reasonable to estimate that 3.3% of Allegiance's expenses come from the LPLP. The general idea is the more revenue a program generates, the more expensive it is to operate.

Michelle DeFouw's testimony supports this approach. DeFouw, a former Allegiance Chief of Staff, testified that in determining the administrative fee to charge for each program, Allegiance considers the complexity of the program, the length of the program, and the costs of administering the program. Thus, the greater the expenses to administer the program, the greater the administrative fee and overall revenue of a program.

b. *Incremental Approach*

Premier's proposed method, the incremental approach, "recognizes that it does not cost as much to produce unit N + 1 if the first N (or fewer) units produced already have paid the fixed costs. Thus, fixed costs—those costs which do not vary with increases in production, such as

9

management salaries, property taxes and insurance—are excluded when determining profits." *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 745 F.2d 11 (Fed. Cir. 1984); *see also Taylor v. Meirick*, 712 F.2d 1112, 1121 (7th Cir. 1983) (approving use of the incremental approach because "[c]osts that would be incurred anyway should not be subtracted, because by definition they cannot be avoided by curtailing the profit-making activity.").

Premier's expert, Bokhart, asserts that Terry's 3.3% calculation is based on an unsupported assumption that the amount of revenue and expenses for various programs are the same. He points to Allegiance COO Dawn Murphy's testimony that some Allegiance programs are more profitable than others and some require more expenses than others. This argument is not persuasive because, as Terry and Murphy explained, the more profitable programs tend to cost more to operate as to claims and processing. In theory, the proportion is consistent across programs with different profits or expenses.

Bokhart also testified that growth rates for different programs changed each year and a more accurate calculation would have broken down the expenses by year. Terry, however, stated that there would not be a meaningful difference between an incremental approach that broke down expenses by year, and the absorption approach which uses averages over the year. The expenses of starting the LPLP would have been higher at the initial period and lower at the end of the period. The discrepancies would have balanced out over the four-year period.

The Parties do not cite to, and this Court has not found, Sixth Circuit cases endorsing one method over another. The Court believes it is logical to use the absorption approach. For example, although building rent did not increase with the addition of the LPLP, it is a necessary cost of administering the LPLP. It is an expense that contributes to the production of the LPLP and should be considered a deductible expense.

**2. Expenses Attributable to the LPLP**

Premier contends Allegiance has not proven any deductible expenses by a preponderance of the evidence and therefore the Court should award the full amount of the revenue. If the Court does not award the full revenue, Premier argues that Allegiance artificially inflated its deductible expenses by including categories of expenses that are unrelated to the LPLP.

Allegiance submits that its total expenses potentially related to LPLP from April 1, 2018, to October 31, 2021, were $24,150,842, and consisted of the following expense categories: Salaries and Benefits, TAG, Facility, Communications, General and Administrative, Insurance, and Audit and Tax Fees. (*See* Trial Ex. 138.) To calculate expenses that should be attributed to the LPLP, Allegiance's expert, Douglas Terry, applied the percentage, 3.3%, to the total expenses within these categories—$24,150,842. Applying 3.3% to $24,150,842 yields $798,877 in expenses attributable to the LPLP.

Premier attacks the following expense categories: Salaries and Benefits, Facility, Professional Services, TAG Management Fees, Depreciation. The Court acknowledges that Allegiance decided which categories should be included; Terry did not determine the categories of expenses related to LPLP himself.

a. *Salaries and Benefits Relating to Scioto Subsidiary*

Premier contends that Allegiance should not have included all its salaries and benefits expenses in the total expenses related to LPLP because some of its employees work for Scioto. Scioto is a wholly owned subsidiary of Allegiance that provides obligor duties to Allegiance. Dawn Murphy testified that "minimal people" from Allegiance complete filings for Scioto and there is no revenue or expenses from Scioto. Premier did not show sufficient evidence to rebut her testimony. The Court finds her testimony credible, and on balance, determines that Allegiance

11

proved by a preponderance of the evidence that 3.3% of its employee's salaries and benefits are a deductible expense.

b. *Facility Rental*

In its post-trial brief, Premier argues that the facility rental costs should not be included in expenses attributable to LPLP because there are other companies, such as Scioto, operating in those facilities. However, Premier cites to deposition transcripts that were not entered into evidence at trial and are not part of the trial record. Evidence relating to facility expenses came solely from Michelle DeFouw, who testified that there are no other companies operating in the same buildings. Thus, Allegiance proved by a preponderance of the evidence that 3.3% of its facility rent and costs is a deductible expense.

c. *Professional Services*

The Professional Services category of expenses includes actuarial consulting and human resources. Premier asserts that Professional Services should not be included in the expenses related to the LPLP but did not present compelling evidence in support. Dawn Murphy, Allegiance's Chief Operating Officer, testified that actuarial and HR support every program, including LPLP. Actuarial and human resources also helped onboard the LPLP from May 2018 to December 2018. Therefore, the Professional Services category of expenses are properly included in deductible expenses.

d. *TAG Management Fees*

The TAG Management fee is a flat fee of $400,000 that Allegiance pays annually for management consulting and administrative services. The TAG Management team includes Brian Leslie, Allegiance Chief Financial Officer. Mr. Leslie's salary is included in the TAG Management fees.

Premier contends that there is no evidence that the TAG fee supported the LPLP. According to former Allegiance Chief of Staff Michelle Defouw, however, the TAG team provides Allegiance with Canadian tax structure guidance, which is especially used for the LPLP. Defouw testified that the LPLP has a heavy reliance on the TAG program because it operates in Canada. From this testimony, Allegiance proved by the preponderance of evidence that the TAG Management fees is supports the LPLP and is therefore a deductible expense.

e. *Depreciation*

The Depreciation Expense category is the depreciation cost of servers, computers, and other assets used to administer the programs. Plaintiff argues that this is not attributable to the LPLP because the Depreciation Expense increased from 2018 to 2021 but the LPLP revenue decreased. Dawn Murphy testified that computers and servers service the LPLP and therefore the cost is attributable to it. There was no other evidence presented that addressed Depreciation Expenses. Allegiance did not sufficiently flesh out the relationship between the depreciation expenses and the LPLP. The Court is not convinced the increasing depreciation expense is attributable to LPLP. Because Allegiance did not prove by a preponderance of the evidence that Depreciation Expenses are a deductible expense, that category will not be included in the deductible expenses.

From the $24,150,842 in total Allegiance expenses potentially related to the LPLP, the Depreciation Expense category, $620,906, is subtracted from that amount for a new total of $23,529,936 in expenses related to LPLP. Multiplying that number by 3.3% equals $776,488. Then, subtracting the $10,671 in currency exchange difference, the total expense amount equals $765,817. Therefore, from the $1,169,851 in LPLP revenue between April 1, 2018, and October 31, 2021, $765,817 is deductible expenses and $404,034 is profit.

### C. Additional Profit from October 31, 2021 to April 30, 2022

The Parties calculated damages from April 1, 2018 to October 31, 2021, instead of the proper end date, April 30, 2022, to give the experts time to rebut each other's proposed calculations and conduct further discovery if necessary. As stated above, the amount of damages that Allegiance is entitled to from April 2018 to October 2021 is $404,034, which equals the total revenue, $1,169,851, minus the expenses, $765,817. These numbers yield a ratio of 34% profit to 66% expenses.

To calculate the remaining profit Premier is entitled to—the LPLP profit Allegiance received from October 2021 through April 2022—Allegiance proposes that the Court apply the profit margin to Allegiance's applicable revenue from October 2021 through April 2022. Allegiance received an additional $109,429 in revenue during that time. 34% of $109,429 equals $37,206. Therefore, Premier is entitled to an additional $37,206 on top of the $404,034 in profit from April 2018 to October 2021.

In sum, Premier is entitled to receive $441,239 in lost profits for Allegiance's copyright infringement of the LPLP Certificates.

### IV. Conclusion

For the foregoing reasons, it is hereby **ORDERED** that Plaintiff shall recover from Defendants $441,239.00 in copyright infringement damages.

**IT IS SO ORDERED.**

**8/29/2022**                                                         **s/Edmund A. Sargus, Jr.**
**DATE**                                                                   **EDMUND A. SARGUS, JR.**
                                                                         **UNITED STATES DISTRICT JUDGE**